14 A.3d 1179

Giuseppina MUTI, et al.

v.

UNIVERSITY OF MARYLAND MEDICAL
SYSTEMS CORPORATION.

No. 1991, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Feb. 4, 2011.

Reconsideration Denied April 6, 2011.

562

Julia R. Arfaa & Benjamin S. Salsbury (Salsbury, Clements, Bekman, Marder & Akins, LLC, on the brief), Baltimore, for appellant.

Janet A. MacDonald (Susan T. Preston, Goodell, DeVries, Leech & Dann, LLP, on the brief), Baltimore, for appellee.

Panel: WOODWARD, MATRICCIANI, and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

MATRICCIANI, J.

On September 23, 2008, appellants, Giuseppina, Tom, and David Muti, filed a complaint in the Circuit Court for Baltimore City, naming appellee, University of Maryland Medical System Corporation ("UMMS"), as the sole defendant and claiming three counts of wrongful death and one count of medical negligence as a survival action. On August 31, 2009, appellee moved to dismiss appellants' wrongful death claims and, in the alternative, for summary judgment on all counts. The trial court granted appellee's motion to dismiss and entered summary judgment in appellee's favor on the remaining survival claim. Appellants filed timely notice of this appeal on October 30, 2009.

## QUESTIONS PRESENTED

Appellants present two questions for our consideration, which we have edited for clarity:

I.   Did the trial court err when it dismissed appellants' wrongful death claims without leave to amend?

II.  Did the trial court err when it granted summary judgment in favor of appellee in appellants' negligence action?

For the reasons set forth below, we answer yes to both questions. Therefore, we vacate the court's order of dismissal, reverse the order granting summary judgment, and remand this case for further proceedings in the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

Elliot Muti suffered an acute myocardial infarction on January 20, 2005. He was first admitted to Mercy Hospital, where he underwent a cardiac catheterization of the left circumflex with stent. Mr. Muti's physicians discovered a ninety-percent

stenosis of his left posterior descending artery that was not amenable to stenting, and so they transferred him to the care of appellee, UMMS, for emergency coronary bypass surgery later that day.

As part of the bypass surgery, UMMS physicians intubated Mr. Muti. On each of the two days following his bypass surgery, physicians performed a bronchoscopy, but blood in the catheter area prevented them from visualizing the trachea. Doctors attempted to extubate Mr. Muti on January 22, 2005, but had to perform an emergency re-intubation immediately afterwards. Mr. Muti was again extubated on January 26, 2005, but developed respiratory complications and was again intubated on February 6, 2005. Radiological studies taken over the next two days indicated the presence of air in Mr. Muti's chest cavity, a condition known as "pneumomediastinum."

On February 9, 2005, Mr. Muti's thoracic surgeon performed a bronchoscopy and noted a two-to-three millimeter "injury in the anterior tracheal wall just to the left of the midline 1 ring above the carina bifurcation." The surgeon noted that Mr. Muti had sepsis from both pulmonary and gastroenterological origin and was on high ventilator settings, and therefore "encouraged the ICU team to minimize the pressure control ventilation" and ordered another radiological study to rule out esophogeal injury.

Following his bronchoscopy, Mr. Muti experienced worsening respiratory failure and mid-chest inflammation. Mr. Muti developed pneumonia, ventricular tachycardia, and renal failure, and died on March 4, 2005, at the age of 65.

Appellants filed a complaint and request for jury trial in the Circuit Court for Baltimore City on September 23, 2008, alleging medical negligence as a survival action on behalf of the decedent, Elliot Muti.[1] Appellants amended their com-

---

1. Appellants had filed a Statement of Claim with the Health Care Alternative Dispute Resolution Office on January 18, 2008. Appellee

plaint on August 26, 2009, to add wrongful death counts corresponding to each of the three appellants. In each of appellants' three wrongful death counts, they further alleged that, as a direct result of appellee's negligence, "which culminated in the death of the Decedent," each of them suffered damages.

The suit proceeded to discovery, and appellants were deposed on February 2, 2009. At the deposition, they revealed—to the apparent surprise of both sets of counsel—that Elliott Muti had adopted a son, "Ricky," during a previous marriage. Appellants testified that Ricky Muti had not lived with his father since 1977, that none of them had been in contact with him since 1987, and that they did not know how to contact him.

On August 31, 2009, appellee moved to dismiss appellants' wrongful death claims for failure to join a necessary party and moved for summary judgment on all counts; appellants opposed each of these motions. The parties submitted exhibits with their motions and oppositions, including deposition testimony from appellants' experts, Dr. Brian McAlary and Dr. Monroe Karetzky.

Dr. McAlary is a board certified anesthesiologist. Appellants designated him to testify concerning breaches in the standards of care related to Mr. Muti's tracheal tear and appellee's alleged failure to treat the tear in a timely manner.

In his deposition,[2] Dr. McAlary testified as to the factual foundation for his opinion that the circumstances indicated negligence on the part of Mr. Muti's treating physicians:

> [I]njuries to the trachea would be in the category of those types of airway injuries that would be the least likely to not

---

elected to waive arbitration on August 20, 2008, and the matter was transferred to Circuit Court for Baltimore City.

**2.** The testimony appearing throughout this opinion is culled from the parties' exhibits attached to their respective motions and responses in the record.

be related to negligent care. That was very poorly stated. Let me see if I can rephrase that.

\* \* \*

Injuries to the trachea would be the least common of airway injuries and the highest majority of those would be negligent in nature.

Q. And what do you base that statement on?

A. No one thing. Certainly, it was part of my training. I think it's conventional wisdom among those that I've worked with for years.

\* \* \*

Q. So is there anything I could go and look at that would support your statement that injury to the trachea is most commonly associated with negligence when it occurs in the setting of endotracheal intubation at this point?

A. No.[3]

Dr. McAlary further explained his reasoning when asked if the physician performing the intubation breached the standard of care:

[F]irst of all, it starts with the probability that it was during the placement of the double-lumen tube when the subsequent documented tracheal—distal tracheal injury occurred.

Second of all, it would be highly unlikely for a lesion on the mucosal side of the trachea to be caused by anything done by, for example, the surgical caregiver.

Thirdly, there was nothing described in this record either prior to or subsequent to this surgery that would indicate that this patient had significant predisposing factors such as those we discussed before that would put this patient's trachea at significant greater risk of injury absent improper technique or inappropriate force.

---

**3.** Dr. McAlary continued his answer to that question, but the exhibit cuts off in mid-sentence as he states: "No. If I were to go and see if there is any citation that addressed itself to that, I . . ."

Q. So is it your testimony, Doctor, that because in your review of the records this patient was not at high risk for a tracheal injury and because based upon your opinion a tracheal injury did occur during placement of the double-lumen tube that there had to have been negligence?

A. Fundamentally, yes, in this particular setting.

Finally, Dr. McAlary opined that the mechanism of injury to Mr. Muti's trachea was "[p]robably the failure to rotate the double-lumen tube prior to reaching the carina."

Dr. McAlary also testified that the tracheal tear contributed to Mr. Muti's respiratory failure:

A. It would be a combination of any underlying pulmonary pathology, as we've discussed before. It would be the super-imposed impact of even a minimal thoracotomy on ventilatory insufficiency. It would have been whatever amount of material leaked from the tear. And it would have been some degree of pulmonary edema. So it would have been multifactorial.

Q. Are you able to quantify out the degree to which the tracheal tear contributed to the respiratory failure and in the immediate postoperative period?

A. Not really.

Q. Do you have an opinion as to whether Mr. Muti would have suffered respiratory failure in that immediate postoperative period even if he had not had the tracheal tear? A. Only to the extent it would have been likely significantly less severe.

Q. And what do you base that on?

A. Statistically, that patients even with smoking histories, documented COPD, who undergo minimally invasive thoracotomies and who have no injury to the tracheobronchial trees usually can be extubated significantly sooner and their chest X–rays are usually not as involved, particularly on the contralateral side.

Appellants' second expert, Dr. Karetzky, is board certified in internal, geriatric, and critical care medicine and had prac-

ticed in those areas for more than forty years. Appellants designated Dr. Karetzky to testify concerning breaches of the standards of care in failing to address the tracheal tear and its sequelae in a timely manner with appropriate diagnostic methods or treatment.

Appellants further designated Dr. Karetzky to testify that "these deviations from the standards of care were a proximate cause of Mr. Muti's injuries in this case."

Dr. Karetzky testified, in relevant parts:

[T]he diagnosis of pneumomediastinum indicated the traumatic event, which was subsequently confirmed on bronchoscopy and that this should have been done in a timely fashion to repair it before it sealed off itself. . . .

\*　　\*　　\*

The diagnosis was confirmed on C.T. scan that there was pneumomediastinum. The C.T. scan was not done until the 7th and it could have been done on the 6th and then air would have been seen on the 6th. As soon as the air is seen, he should have had a bronchoscopy to confirm the tear and to repair it.

\*　　\*　　\*

Q. Okay. Now, Doctor, do you have an opinion to a reasonable degree of medical probability that Mr. Muti would have survived a surgical procedure on February 6th or 7th had one been done to repair his tracheal tear?

A. I believe he would have, yes. To a reasonable degree of medical probability, I think that he would have survived and the subsequent problems that he had, which proved life-threatening, would have been alleviated.

Q. And what, Doctor, do you rely upon for that opinion?

A. Excuse me? I'm—what do I rely on for that opinion?

Q. Yes, sir.

A. I think you mentioned my 40 years of training and the literature—

Q. Do you depend on anything else?

A. And the lit—I'm sorry—and the literature of mediastinitis and the literature of pneumomediastinum.

Dr. Karetzky further opined that Mr. Muti's respiratory and pulmonary problems are not normally associated with his pre-existing conditions and that the incidence of respiratory failure following coronary artery bypass surgery is less than five percent.

The circuit court heard appellee's motions to dismiss and for summary judgment on October 2, 2009. The court first heard and granted appellee's motion to dismiss, ruling as follows:

Okay. The Court is going to grant the motion to dismiss. The Court is going to grant it for several reasons. Well, actually, not really. I shouldn't say for several reasons, for one reason.

Maryland Rule 15–1001(b) states that in a wrongful death case that all persons who are or may be entitled by law to damages by reason of the wrongful death shall be named as plaintiff whether or not they are joined in the action. The words "to the use of" shall precede the name of any person named as a plaintiff who does not join in the action.

And in fact, because of the way the Rule is stated, although this is not a motion to dismiss, this is a—oh, yes, it is a motion to dismiss. Actually, this could have been a motion for summary judgment at this point, but it could be considered—I mean, because substantively it is an issue and that person is clearly a necessary party.

And actually the fact that plaintiffs may or may not have known where he is located, first of all, there's nothing before the Court by way of evidence to show that. There's counsel's statement but there's no affidavits or other things to show that. So that issue is not before the Court.

But, even if it were, even if that were the issue, as I said, I mean, at the start of the case obviously they would have named him and said we're in the process of looking for him and everyone would have been on notice about that and that was not what happened here.

Also, the reason for that is the Court in applying the law is not to look to say [sic] whether or not this will make it difficult for one party or the other if the law says that this is the result is going to be. So, that motion will be granted.

The circuit court then entertained arguments on appellee's motion for summary judgment. At their conclusion, the court ruled:

The Court rejects plaintiffs theory that in this—the context of this case that it would be sufficient to go to the jury to have Doctor Macalary [sic] say there was a breach of the standard of care on January 21st or the date, if I have it right, the date of the first intubation.... January 20th, to have it—there was a breach of the standard of care on January 20th without giving any causation and there's no testimony that has been directed—this Court's attention has been directed to that is part of this record that he gave any testimony on causation.

And to have a second expert say no, the tear occurred on February 6th with no testimony from that expert that on February 6th there was a breach of the standard of care that created the tear. And to have testimony from plaintiffs [sic] own experts that the tear could have occurred for a series of reasons.

Let me see. I wrote them down. That any foreign— plantiffs [sic] expert testified that any foreign object could cause the injury, that it was not possible to rule out the fiberoptic bronchoscope as a cause of the injury, that the injury could occur spontaneously, that the injury is a known and reported risk associated with accessing of the airway, the injury is a known and reported risk of endotracheal intubation and the injury is not always caused by negligence.[ ]

Because of that—and in [*Meda v. Brown* ] is just simply circumstantial evidence. I mean, what the Court is saying is that the fact that a case is a medical malpractice case doesn't stop it from being circumstantial evidence. But that

is not circumstantial evidence. In fact, to the contrary. Plaintiffs' experts actually rebut it.

So, those two together could not somehow give the jury an either/or choice that it having [sic] taken place either one.

And there is no testimony—there certainly is under no circumstances any testimony that ties up any causation to a breach of the standard of care.

First of all, as I said, Doctor Macalary [sic] is not at all— he doesn't give—he doesn't give a causation. And then the second expert, which is Doctor—I forget his name but the second expert—

MS. MACDONALD: Karesky [sic], Your Honor.

THE COURT: Doctor Kare[t]sky who said he didn't believe the February 6th intubation was negligent that instead, that the issue was what took place between February 6th and February 9th.

And even as to that he testified—wait. He said that required surgical repairs, that the failure was a failure of the surgeon to repair. But there was no testimony that a surgeon breached the standard of care.

And Doctor Kare[t]sky made it clear that he was not in a position to say that the surgeon breached the standard of care because that was not within his area of expertise and based upon his testimony as well as Maryland case law and Maryland Courts and Judicial Proceeding Code Annotated Section 2(a)02(c)(1), he would not have been permitted to testify about it anyway based upon what he described as his experience.

The circuit court subsequently issued orders that dismissed appellants' wrongful death claims without leave to amend and granted summary judgment to appellee on the remaining survival claim.[4] Appellant filed timely notice of this appeal on October 30, 2009.

---

4. The trial court issued two orders following the motions hearing. The first order states that appellee's "Motion to Dismiss is GRANTED and it

**574**

DISCUSSION

**I.**

■ Appellants first argue that the circuit court erred when it dismissed their wrongful death claims without leave to amend. Appellee argues that the trial court did not err because appellants did not move to amend their pleadings, and that dismissal with prejudice was the proper result.

Maryland Code (1974, 2006 Repl. Vol. I), § 3–904 of the Courts and Judicial Proceedings Article ("CJP") governs wrongful death claims and provides:

(a) *Primary beneficiaries.*—(1) Except as provided in paragraphs (2) and (3) of this subsection, an action under this subtitle shall be for the benefit of the wife, husband, parent, and child of the deceased person.

\* \* \*

(c) *Damages to be divided among beneficiaries.*—(1) In an action under this subtitle, damages may be awarded to the beneficiaries proportioned to the injury resulting from the wrongful death.

\* \* \*

(f) *Restriction to one action under this subtitle.*—Only one action under this subtitle lies in respect to the death of a person.

---

is further ORDERED that Count I of the Amended Complaint is DISMISSED without leave to amend." Count one of the complaint, however, is appellants' survival claim. It appears that the confusion stems from appellee's "Motion to Dismiss Plaintiffs' Wrongful Death Claim for Failure to Join a Necessary Party," which alternates between incorrectly addressing a single "claim" and correctly addressing multiple "claims."

In light of the pleadings and motions, as well as the court's ruling on the record in open proceedings, it is clear that the court intended to dismiss counts two, three, and four of the complaint, and that the remaining order granting summary judgment—which did not specify a count—pertained to count one, which survived the motion to dismiss. Our decision does not require that we correct these documentary errors because our mandate vacates the order of dismissal and reverses the order entering summary judgment.

(g) *Action to commence within three years; deaths caused by occupational disease.*—(1) Except as provided in paragraph (2) of this subsection, an action under this subtitle shall be filed within three years after the death of the injured person.

Pleadings in wrongful death claims fall under Maryland Rule 15–1001, which states, in relevant part:

(b) **Plaintiff.** If the wrongful act occurred in this State, all persons who are or may be entitled by law to damages by reason of the wrongful death shall be named as plaintiffs whether or not they join in the action. The words "to the use of" shall precede the name of any person named as a plaintiff who does not join in the action.

■ Here, there is no dispute that the plaintiff's estranged son, Ricky Muti, is a person who "may be entitled by law to damages by reason of the wrongful death" under CJP § 3–904.[5] There is also no dispute that Ricky Muti was not named as a plaintiff or "use plaintiff," as required by the Maryland Rules of Procedure. Rule 15–1001(b) does not, however, provide a specific remedy in such a case. Thus, in accordance with Rule 1–201, the trial court "may compel compliance with the rule or may determine the consequences of the noncompliance in light of the totality of the circumstances and the purpose of the rule." *See Jones v. Prince George's County,* 378 Md. 98, 117, 835 A.2d 632 (2003) ("standing to bring a wrongful death action is a procedural matter to be covered by rules and not an issue of substantive law"). We therefore turn to precedent to determine whether the trial court abused its discretion when it dismissed appellants' claims with prejudice. *See Gaetano v. Calvert County,* 310 Md. 121, 126, 527 A.2d 46 (1987) (trial court abused its discretion when it dismissed claims without considering the factors of Rule 1–201(a)).

---

**5.** Section 3–904(a)(1) of the Courts and Judicial Proceedings article provides that the primary beneficiaries in a wrongful death action include any "child," which is defined in § 3–901(b) as "a legitimate or an illegitimate child." The parties do not dispute that Ricky Muti, as an adopted child, should be considered a "legitimate child."

The decedent in *Walker v. Essex,* 318 Md. 516, 518, 569 A.2d 645 (1990), was survived by his two infant sons, each from a different mother.[6] The mother of one son agreed to settle with the defendants' insurer, who was unaware of the other son. *Id.* The insurer contested the arrangement upon learning of the other son, but the trial court enforced the settlement agreement by entering a judgment against the defendants. *Id.*

The *Walker* Court "considered whether the settlement by one wrongful death beneficiary requires the consent of the other joined beneficiaries or the approval of the court." *Id.* The Court began by briefly reviewing the history and intent of Maryland's wrongful death statute:

"The common law not only denied a tort recovery for injury once the tort victim had died it also refused to recognize any new and independent cause of action in the victim's dependents or heirs for their own loss at his death." *Prosser & Keeton on Torts* § 127 at 945 (W. Page Keeton 5th ed. 1984). In response to this harsh rule, the English legislature created a cause of action for wrongful death by enacting the Fatal Accidents Act of 1846, also known as Lord Campbell's Act. 9 & 10 Vict. c. 93. Every American state subsequently adopted its own wrongful death statute. 2 S. Speiser, *Recovery for Wrongful Death 2d* Appendix A (1975, 1988 Supp.).

In 1852, Maryland adopted a statute strongly resembling Lord Campbell's Act. 1852 Maryland Laws Chapter 299. Currently, the relevant section of the wrongful death subtitle states:

(f) *Restriction to one action under this subtitle.*—Only one action under this subtitle lies in respect to the death of a person.

Cts. & Jud.Proc., § 3–904(f). We have often stated the purpose of the one action rule is to protect a defendant from

---

**6.** Paternity was only alleged but deemed sufficient for purposes of review.

being vexed by several suits instituted by or on behalf of different equitable plaintiffs for the same injury, when all the parties could be joined in one proceeding.

318 Md. at 522–23, 569 A.2d 645.

The *Walker* Court then explained that while the English statute vested the cause of action in the decedent's estate, under Maryland law the suit is brought in the name of a person entitled to recover, to the "use of" any other interested parties. *Id.* at 523, 569 A.2d 645. The Court therefore concluded:

> When looking to the direction of § 3–904(b), we are told that "only one action under this subtitle lies in respect to the death of a person." We are also instructed that, if a recovery or verdict is obtained in this one action, the amount recovered shall be "divided among the beneficiaries in shares directed by the verdict." The statutory language does not allow a judgment for one of the beneficiaries to be made a matter of record, as by its very nature, other claims are forever foreclosed or barred. The trial judge in this case considered the claims of the beneficiaries to be severable. The statute does not. A judgment should not have been entered in the circuit court unless it included the interests of all of the known beneficiaries.
>
> Additionally, the beneficiaries were children of tender years. Marcus was just six years of age. The circuit court, accordingly, should have been concerned all minor beneficiaries shared in the judgment and the available proceeds. The judge obviously would not want to foreclose the interest or claim of Marcus. The entry of judgment, however, had precisely this effect. We shall vacate the judgment on behalf of Lupe, Jr. and remand the case for further proceedings.

*Id.* at 523–24, 569 A.2d 645.

The facts of *Walker* concerned only a settlement, but it nevertheless indicated that the purpose of Rule 15–1001 is to minimize prejudice to the defendants and the absent plaintiffs. We find further support for this proposition in *Williams v.*

*Work,* 192 Md.App. 438, 455, 995 A.2d 744 (2010), *cert. granted,* 415 Md. 607 (2010), where we held that, "[a]lthough Rule 15–1001(b) does not require formal joinder, the failure to include a known statutory beneficiary as a plaintiff or a 'use plaintiff' in a wrongful death action and to settle without providing for that beneficiary can be analogized to the failure to join a necessary party in an action where joinder is required."

■■ With this background in mind, we turn to the case at hand. As stated above, there is no dispute that appellants failed to comply with the requirements of Rule 15–1001. Appellants argue that compliance with Rule 15–1001 was impossible because Ricky Muti's whereabouts were unknown, and they emphasized that Ricky may not even be alive; but those proffers are irrelevant. In a situation such as this, where a party cannot be joined, Rule 15–1001 requires only that the real parties in interest name each use plaintiff and "mail a copy of the complaint by certified mail to any use plaintiff at the use plaintiff's last known address." There is nothing in the record to indicate that appellants could not have substantially complied with Rule 15–1001 by sending notice to his last known address and amending the pleadings to name him as a use plaintiff.

Appellants did not comply with Rule 15–1001, and because the court could not have rendered judgment without the use plaintiff, we cannot say that the court abused its discretion when it dismissed their claims. *See, e.g., Williams v. Work,* 192 Md.App. at 452, 995 A.2d 744 ("... Rule 15–1001 is in the nature of a joinder rule or a condition precedent that requires that all known statutory beneficiaries, *i.e.,* the real parties in interest, be identified as parties to the litigation.").

■■ The question remains, however, as to whether the trial court should have granted appellants leave to amend their pleadings. In light of our foregoing discussion, the trial court erred when it held that it would grant appellee's motion to dismiss for "one reason," namely that "the Court in applying the law is not to look to [see] whether or not this will make

it difficult for one party or the other." The clear import of Maryland's rules of procedure and case law is to the effect that, before dismissing a complaint under the auspices of Rule 15–1001 for failure to name a use plaintiff, the court *must* consider whether doing so will prejudice that use plaintiff.[7] Indeed, appellee all but proved that point when it cited Rule 2–211(c) in its motion to dismiss to argue: "Plainly, Ricky Muti … is a necessary party … [whose] rights and interests arose out of his father's death and are required to be adjudicated with all of the other Wrongful Death claims in this case."

For these reasons, the court erred when it did not grant appellants leave to amend their pleadings to name Ricky Muti as a "use plaintiff" without first considering whether he would be prejudiced thereby. Because this was not done, the record is insufficient to determine whether dismissal should ultimately have been granted. We therefore vacate the judgment of the circuit court granting appellee's motion to dismiss and remand the wrongful death claims for further proceedings.[8]

## II.

Appellants next argue that the trial court erred when it granted summary judgment in favor of appellee in appellants'

---

7. We note that appellants appear to have contributed to this error, to a certain extent. Appellants proffered that they would amend their pleadings only when the court asked what they would do if Ricky Muti were located. That not being the case, and with no evidence of what appellants had done to locate him, the court was left with appellants' argument that "[t]here would be nothing [they] could do but to name him," which they maintained would not be "proper pleadings" according to the rules and case law. As explained above, there is no basis for that argument because Rule 15–1001 allows for that circumstance.

Appellants' arguments thus placed the court in an untenable position, and the error in dismissing their claims is an understandable consequence. However, our review of case law makes it clear that third-party interests are integral to Rule 15–1001, which compels a trial court to account for unrepresented interests, notwithstanding the actions or inactions of the real parties in interest.

8. Our mandate is guided by Rule 2–322(c), which provides that if the court disposes of a preliminary motion to dismiss, "an amended complaint may be filed only if the court expressly grants leave to amend."

survival action. Summary judgment is proper where the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law. Md. Rule 2–501(f). We review summary judgment *de novo* and ask whether the trial court was correct as a matter of law. *Chesek v. Jones*, 406 Md. 446, 458, 959 A.2d 795 (2008) (citations omitted). In doing so, we review the factual record independently and view all facts and inferences in a light most favorable to the non-moving party. *David A. Bramble, Inc. v. Thomas*, 396 Md. 443, 453–54, 914 A.2d 136 (2007) (internal citations omitted).

Appellants' survival action claimed medical malpractice, whose "elements translate into a duty of care owed by the health care provider to the patient; a breach of the applicable standards of care; proximate causation of a medical injury; and damages." *State v. Copes*, 175 Md.App. 351, 370, 927 A.2d 426 (2007) (citations omitted). "An 'injury' occurs for purposes of a medical malpractice action at such time as a negligent act is coupled with some harm." *Id.*

The parties do not dispute that appellee and its agents owed appellant a duty to adhere to the relevant standards of care. Appellee's motion for summary judgment attacked the remaining elements and argued that summary judgment was appropriate because the testimony from appellants' two experts failed to establish breach, causation, or injury.[9] Thus, appellants should prevail in this appeal if the facts and inferences, taken in a light most favorable to them, could establish breach, causation, and injury.

Appellants provided two theories of breach and a theory of causation that unified them, so it is worth taking a moment to review those theories before we examine the expert testimony

---

9. Having dismissed appellants' wrongful death claims, the court did not need to consider the expert testimony concerning Mr. Muti's ultimate demise. Thus, the only remaining and relevant injuries, as alleged in the survival claim, were Mr. Muti's conscious pain and suffering, medical expenses, and other financial losses.

supporting them. First, appellants relied upon Dr. McAlary's testimony to prove that appellee's anesthesiology staff breached the standards of care when they intubated Mr. Muti on January 20, 2005, causing a tracheal tear and resultant medical complications.[10] Second, appellants relied upon the testimony of Dr. Karetzky to prove that appellee's critical care staff breached the standards of care when they failed to diagnose the tracheal tear as of February 6, 2005, and failed to treat the tracheal tear, causing Mr. Muti's aforementioned injuries and medical complications.

## A. Combined Expert Testimony

■ Appellee argues that, taken either separately or together, the opinions testified to by appellants' experts are insufficient to establish a coherent theory of liability because they are in irreconcilable conflict. We disagree.

Recognizing that the jurors would be entitled to believe all, some, or none of either expert's opinions,[11] we note that Dr. Karetzky's testimony concerning the diagnosis and treatment of Mr. Muti's condition is not dependent on Dr. McAlary's testimony concerning the creation of his tracheal tear. Dr. Karetzky's relevant testimony concerns the appellees' failure, on or after February 6, 2005, to diagnose and treat the tracheal tear. The single unifying fact is that the tracheal tear occurred and set in motion a series of medical problems addressed sequentially in the experts' respective testimony.

Moreover, appellee misinterprets Dr. Karetzky's testimony to argue that the experts held conflicting opinions of whether appellee's physicians breached the standards of care during

---

10. Appellants also designated Dr. McAlary to testify that appellee's physicians negligently failed to treat the tracheal tear, but that portion of his testimony has not been disputed by either party.

11. *See Edsall v. Huffaker,* 159 Md.App. 337, 343, 859 A.2d 274 (2004) ("'[T]he jury was free to accept or reject all or any part of any witness's testimony or reports of experts."); *see also State v. Gross,* 134 Md.App. 528, 542, 760 A.2d 725 (2000) (a jury has an "unquestioned prerogative . . . to reject a story in part but to accept it in other part").

any of the intubation procedures. Appellants rely on Dr. McAlary's testimony to establish a breach of the standards of care during Mr. Muti's intubation on January 20, 2005. While Dr. Karetzky's testimony initially focused on the re-intubation on February 6, 2005, he did *not* offer a standard of care opinion with respect to the creation of the tracheal tear. Thus, appellants' expert testimony is not in conflict on the *critical issue* of whether appellee's agents breached the standards of care on January 20, 2005. In fact, Dr. Karetsky stated that February 6, 2005, was the date upon which the tracheal tear should have been *diagnosed*, not when it necessarily *occurred*. Any confusion caused by the experts' emphasis on different critical dates goes only to the weight of their testimony and would be for the jury to consider. Consequently, the record does not reveal any irreconcilable conflict that would mandate summary judgment in appellee's favor.

## B. The Experts' Factual Bases

Appellee next argues that Dr. McAlary's opinion lacks an adequate factual basis as required by Rule 5–702. The parties agree to the general proposition that " '[n]egligence, like any other fact, can be established by the proof of circumstances from which its existence may be inferred.' " *Meda v. Brown*, 318 Md. 418, 427–28, 569 A.2d 202 (1990) (quoting *Western Md. R. Co. v. Shivers*, 101 Md. 391, 393, 61 A. 618 (1905)). The parties also appear to agree that appellants' theory of the case is complex and requires expert testimony on several matters. Appellee focuses particular attention on Dr. McAlary's opinion that appellee's agents breached the standard of care and caused Mr. Muti's injuries.

For the purposes of Rule 5–702, once the trial court has determined that an expert witness qualifies by virtue of his or her knowledge, skill, experience, training, or education, to offer relevant opinion testimony, the only remaining issues are whether there is an adequate factual predicate for his opinions and whether he can express these to

a reasonable degree of probability.[12]   At the summary judgment stage, we must take the evidence in a light most favorable to the non-movant.[13]   Thus, we assume the credibility of the admissible expert testimony in support of the appellants.   Having complied with Rule 5–702's requirements here, the trial court erred in rejecting appellants' survival claim based upon the incorrect conclusion that the expert opinion evidence was legally insufficient.   Dr. McAlary's testimony as to breach was sufficient to allow a reasonable jury to find that the appellee's anesthesiologist incorrectly inserted the double-lumen endotracheal tube by use of "improper force or technique," thus causing the tracheal tear.   Dr. McAlary's testimony also was sufficient to allow a reasonable jury to find that Mr. Muti suffered respiratory distress and other ailments as a consequence.   Therefore, based upon this testimony, a jury could find the requisite elements of causation and breach as matters of fact.

■■■   Appellee's last resort is to argue that Dr. McAlary lacked a factual basis for his opinion because, despite his

---

12.   This case never went to trial, but the court appeared to accept Dr. McAlary's qualifications.   The court expressed some doubt as to whether Dr. Karetzky's opinion testimony would be admissible if his opinion addressed a thoracic surgeon's standard of care, but there was no direct ruling on the matter, and so appellee can present further challenges to it on remand.

13.   We note that the preponderance of evidence standard generally translates to a greater-than-fifty-percent probability (*viz.,* "more likely than not") in cases based on circumstantial evidence.   In the wrongful death context, see *Fennell v. Southern Maryland Hosp. Center, Inc.,* 320 Md. 776, 792–93, 580 A.2d 206 (1990) ("Traditional tort law is based on probabilities.   If a patient had a 49% chance of dying from an injury or disease and if the patient was negligently treated and dies, full recovery will be permitted because, absent the negligence, it was more likely than not that the patient would have survived.   Based on the 51% probability of surviving the injury or disease, we exclude the injury or disease as the cause of death."); *see, generally, Kita v. Borough of Lindenwold,* 305 N.J.Super. 43, 701 A.2d 938, 941 (App.Div.1997) ("circumstantial evidence, as a basis for deductive reasoning in the determination of civil issues, is defined as 'a mere preponderance of probabilities.' " (quoting *Jackson v. Del. L. & W.R. Co.,* 111 N.J.L. 487, 170 A. 22, 24 (N.J.Err. & App.1933))).

training, knowledge, and experience, there was no study proving his ultimate hypothesis that in these circumstances, a tracheal tear is most likely caused by negligence, *viz.*, improper force or technique. We do not find this argument persuasive. It is unreasonable to require appellants or their expert to produce a study whose conditions match all predicate facts of the case and whose conclusions fit the expert's theory. This is especially true where the expert opinion accounts for multiple factors that we would not necessarily expect to see combined in a single statistical inquiry. Instead, Dr. McAlary relied upon his training, knowledge, and experience to infer likelihood from the available facts. In short, the fact that Dr. McAlary lacks a pointed study goes to the weight of the evidence and not its admissibility. *See Rite Aid Corp. v. Levy-Gray*, 162 Md.App. 673, 707, 876 A.2d 115 (2005) (rejecting defendant's argument that plaintiff's experts failed to satisfy Rule 5–702 because they did not provide "a single study or textbook to support" their opinion). Whatever challenges appellee can bring to rebut Dr. McAlary's opinion must be made before the trier of fact.

Taken in a light most favorable to appellants, a jury in the survival action could accept Dr. McAlary's opinion that the evidence supports appellants' theory of breach and causation by a preponderance. The same appears to be the case with Dr. Karetzky's opinion testimony concerning breach and causation on or after February 6, 2005. Thus, appellee's argument that appellants did not raise a factual dispute over those two elements fails.

■ Appellee offers additional arguments that we need not address. Appellee's argument, noted above, that Dr. Karetzky was not qualified to opine on the appropriate standards of care is obviated by our opinion that appellants made out a viable theory of medical malpractice using Dr. McAlary's opinion testimony.[14] Appellee's sole remaining argument ad-

---

14. It is not clear from the record precisely which of appellee's physicians Dr. Karetzky's opinion impugns, but as the case was pled,

dresses the adequacy of Dr. McAlary's testimony on cause of death, which is relevant to a wrongful death claim but not to a survival action for medical negligence. *See Benjamin v. Union Carbide Corp.*, 162 Md.App. 173, 203, 873 A.2d 463 (2005) ("For a survival action to lie, there is no requirement that the injuries sustained by the decedent be the cause of death, thus, death is irrelevant to the cause of action."). The wrongful death claims *sub judice* were dismissed and thus not presented to the trial court; under our mandate, they will be subject to further proceedings in which appellee can address fully this issue. As to the survival action, however, the reasons discussed above compel us to hold that the trial court erred when it granted appellee's motion for summary judgment.

**JUDGMENT GRANTING APPELLEE'S MOTION TO DISMISS VACATED. JUDGMENT GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS, CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 25% BY APPELLANTS AND 75% BY APPELLEE.**

---

appellants' claims survive summary judgment if the evidence could establish liability among any one of appellee's "agents, apparent agents, servants and employees."