37 A.3d 1074

UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION, et al.

v.

Darryl GHOLSTON, Jr., a minor, et al.

No. 2505, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Feb. 10, 2012.

---

322

324

Scott R. Haiber (Hogan Lovells, US LLP, J. Mark Coulson, Miles & Stockbridge, PC, on the brief), Baltimore, MD, for Appellant.

Andrew H. Baida (Benjamin Rosenberg, Caroline L. Hecker, Rosenberg, Martin Greenberg, LLP, Kenneth C. Vogelstein, Keith D. Forman, Wais, Vogelstein & Bedigian, LLC, on the brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, HOTTEN, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

In the Circuit Court for Baltimore City, Darryl Gholston, Jr. ("Darryl"), the appellee and a minor, brought suit through Nicole Player, his mother, for medical malpractice against the University of Maryland Medical System Corporation ("UMMS"), the appellant. The case was tried to a jury for six days. A verdict was returned in favor of Darryl and judgment

was entered for $3.605 million dollars.[1] UMMS moved for judgment notwithstanding the verdict ("JNOV") and for a new trial. The motions were denied and this appeal followed.

UMMS presents two questions for review, which we have reworded slightly:

I.  Was the evidence legally sufficient to support a finding by a preponderance of the evidence that Darryl's injuries were caused by a breach of the standard of care by UMMS?

II. Was the evidence legally sufficient to support a finding by a preponderance of the evidence of damages for future lost wages for Darryl?

For the following reasons, we shall affirm the circuit court's judgment.

## FACTS AND PROCEEDINGS

This case concerns Darryl's premature birth at UMMS, on September 19, 2002. Darryl's mother, Ms. Player, became pregnant in March 2002. Her expected due date was December 24, 2002. She was 23 years old and this was her first pregnancy. Ms. Player received early routine prenatal care at Maryland General Hospital before changing to UMMS.

On August 30, 2002, Ms. Player came to a UMMS clinic for her initial appointment. After a prenatal examination and sonogram that showed cervical shortening, Ms. Player was sent to Labor and Delivery for evaluation. She was 23 weeks pregnant. At UMMS, a physical examination showed that Ms. Player's cervix was prematurely dilated to 4 centimeters, that it was 100% effaced, meaning that it was shortened, and that her membranes, i.e., the amniotic sac in which the developing fetus was located, were bulging. A sonogram was performed, which confirmed the premature dilatation and shortening of

---

1.  The jury's verdict was for $4.1 million dollars. It was reduced, by agreement, to $3.605 million dollars based upon the Maryland cap on non-economic damages. See Md.Code (2006 Repl.Vol., 2011 Supp.), section 11–108 of the Courts and Judicial Proceedings Article.

the cervix and showed increased fluid in the cervical canal. Based upon the measurements from the sonogram, the fetus's estimated gestational age was 23.2 weeks; a full term pregnancy is 38 weeks and beyond. The sonogram measurements also showed an estimated fetal weight of 723 grams, which is slightly more than 1 ½ pounds.

The examination and sonogram were consistent with possible incompetent cervix and premature labor. For those reasons, Ms. Player was admitted to the Obstetrical Service of UMMS for treatment with medication and other modalities. The objective was to extend her pregnancy for as long as possible to increase the likelihood of survival of her fetus. The care she received succeeded in extending the pregnancy for close to three weeks. On September 19, 2002, at 11:42 p.m., Darryl was born by emergency cesarean section. The medical malpractice claim in this case concerns the treatment that was rendered to Ms. Player and Darryl that day.

Between 10:00 a.m. and 11:00 a.m. that morning, a sonogram was performed upon Ms. Player by Christopher Harman, M.D., Director and Vice–Chair of UMMS's Division of Maternal and Fetal Medicine. His sonogram report, which was faxed immediately to obstetrician Lindsay Alger, M.D., revealed findings as stated by Dr. Harman in the comment section of the report: "The umbilical cord has prolapsed through the length of the cervix and lies within a few mm [millimeters] of the vagina. The patient is at extreme risk for PPROM and cord prolapse." PPROM is an acronym for preterm, premature, rupture of membranes. "Cord prolapse" is a condition in which the umbilical cord has descended into the cervix, beneath the baby's location. In the recommendation section of the report, Dr. Harman stated: "I would recommend continuous monitoring on [the Labor and Delivery floor], with readiness for stat [Cesarean section] at all times. Our experience with htis (sic) entity is that it does not presist (sic) for very long without PPROM."

At the same time, Dr. Harman prepared a letter report to Dr. Alger, which also immediately was faxed to her. The letter states in part:

Our 15 minute discussion [with Ms. Player and her family] included transfer to the labor floor for continuous observation there, due to the unexpected diagnosis of occult cord prolapse. Most of the length of the umbilical cord lies within the endocervical canal, and this extends down to the portion of amniotic fluid in the membranes at the external os.[2] Since the cervix is still long, the cord is essentially trapped within the endocervical canal. This is not the same as our more common finding of cord lying above the internal os [3] when there is no presenting part, and does represent an imminent danger of acute cord prolapse, probably life-threatening because the entire length of the cord is in the cervix.

Put in ordinary lay terms, the umbilical cord was within the cervix, below the lowest presenting part of the fetus, thus creating the dangerous condition that the cord could prolapse, that is, be squeezed shut by contractions, thus cutting off the blood flow to the fetus. Dr. Harman also called staff members on the Labor and Delivery Floor and relayed his findings.

As noted above, Darryl was delivered by emergency cesarean section at 11:42 p.m. (The placenta was delivered at 11:43 p.m.) His Apgar scores, which are a measure of neonatal well-being, were 1 out of 10 at one minute, 5 out of 10 at five minutes, and 6 out of ten at ten minutes. He was blue, not breathing, and flaccid with blood pressure that was low and unstable and a significantly reduced blood volume. He was intubated, resuscitated by means of chest compressions and massage, transfused twice, and given medications to elevate and stabilize his blood pressure. He remained in the Neonatal Intensive Care Unit ("NICU") for two months before being discharged to home.

---

**2.** The "external os" is the "external opening of the cervix of the uterus into the vagina." DORLAND'S MEDICAL DICTIONARY 1371 (31st ed. 2007).

**3.** The "internal os" is the "internal orifice of the cervix of the uterus, opening into the cavity of the uterus." *Id.*

According to Ms. Player, Darryl is developmentally delayed. As a young child, he was in a wheelchair. He did not learn to walk until he was 3 ½, and then with the use of braces. He did not start speaking in full sentences until he was 4 ½. At the time of trial, Darryl was nine years old but still was not able to run. He attends school and is in a regular second grade class, but he has an aide to help him.

We shall include additional facts in our discussion of the issues.

## STANDARD OF REVIEW

The standard of review of a question of the sufficiency of the evidence is *de novo. Polk v. State,* 378 Md. 1, 7–8, 835 A.2d 575 (2003). In a civil case, the evidence is legally sufficient to support a finding in support of the prevailing party if, on the facts adduced at trial viewed most favorably to that party, any reasonable fact finder could find the existence of the elements of the cause of action by a preponderance of the evidence. *Hoffman v. Stamper,* 385 Md. 1, 16, 867 A.2d 276 (2005). In a jury trial, the quantum of legally sufficient evidence needed to create a jury question is slight. *Id.* If there is legally sufficient evidence to support a finding in favor of the party bearing the burden of proof, it would be error on the part of the trial judge to grant a motion for judgment in favor of the opposing party and withhold the case from the jury for decision.

The standard of review of a court's denial of a motion for JNOV is the same as the standard of review of a court's denial of a motion for judgment at the close of the evidence, *i.e.,* whether on the evidence presented a reasonable fact-finder could find the elements of the cause of action by a preponderance of the evidence. *Washington Metro. Area Transit Auth. v. Djan,* 187 Md.App. 487, 491–92, 979 A.2d 194 (2009). The standard of review of the denial of a motion for new trial is abuse of discretion. *Miller v. State,* 380 Md. 1, 92, 843 A.2d 803 (2004).

## DISCUSSION

## I.

### *Sufficiency of Evidence of Causation*

■ The case at bar is a tort action for medical malpractice, which is a form of negligence. UMMS was the sole defendant, as the employer of the health care providers involved in the critical aspects of Darryl's care. The elements of the tort are duty (standard of care); breach of the standard of care; causation of injury; and damages. *Muti v. Univ. of Md. Med. Sys. Corp.*, 197 Md.App. 561, 580, 14 A.3d 1179 (2011). In its first question presented, UMMS contends the evidence adduced at trial was legally insufficient to support a reasonable finding, by a preponderance of the evidence, that any breach in the standard of care by its agents was the cause-in-fact or the legal cause of Darryl's injuries.[4]

Darryl's theory of prosecution at trial, which was presented primarily through the testimony of expert witnesses, was that there were two deviations from the standard of care that caused his injuries. Darryl's primary theory of breach was that from 10:15 to 10:45 p.m., Ms. Player exhibited the symptoms of an acute cord prolapse that Dr. Harman had predicted and specifically warned about in his earlier sonogram report and letter; and that the standard of care required that the physician agents of UMMS perform an immediate cesarean section in the face of those symptoms. That did not happen, however, and there was a delay in delivery of approximately 40 minutes. Darryl's second theory of breach focused on an earlier period in the day in question, at about 5:00 p.m. At that time, physician agents of UMMS failed to determine that Ms. Player had a serious infection that necessitated immediate

---

4. UMMS does not challenge on appeal the jury's finding that agents of UMMS breached the standard of care in their treatment of Ms. Player and Darryl. Although UMMS vigorously defended the standard of care issue at trial, and still maintains that there were no breaches, it by design has not argued that the trial court erred in sending the breach of standard of care issue to the jury for decision.

delivery of the fetus; and if delivery would have taken place then, Darryl would not have suffered the injuries he did.

Six expert witnesses testified on behalf of Darryl: David Massari, Ph.D., a neuropsychologist; Daniel Adler, M.D., a pediatric neurologist; Richard Stokes, M.D., an obstetrician/gynecologist; Carolyn Crawford, M.D., a neonatologist; Steven Shedlin, a certified rehabilitation counselor specializing in vocational rehabilitation; and Nancy Bond, R.N., who presented a "life plan" detailing the care Darryl would require.

Dr. Massari explained that, as a neuropsychologist, he is experienced in assessing adults and children with brain injuries. He examined Darryl's past medical records and performed a physical examination of him. Dr. Massari determined that Darryl has an I.Q. in the high 80's, which is in the lower 20th percentile, *i.e.,* low average. He has deficits in expressive language and communication skills, in particular in his ability to articulate thoughts. He has significant deficits in his copying skills and his visual memory. He is very weak in his "emerging executive functions," that is, his decision-making and organizational abilities. He also suffers from deficits in pure fine motor speed and dexterity, and manifestations of cerebral palsy. Dr. Massari acknowledged that Darryl's deficits were even more acute when he was younger than they are now. As a young child, he functioned in the mentally retarded range and could not walk or talk at the ages at which children learn to do so. He has since improved, and is functioning well in the second grade. Dr. Massari opined, however, that Darryl's ability to function likely will peak in middle school and fall as he reaches the age at which abstract and conceptual thinking becomes important. He probably will graduate from high school but will not be able to complete college. And the types of vocations, either "blue collar" or "white collar," that he might be suited to, given his likely level of education, he will have difficulty accomplishing because of his deficits in motor skills, strength, speed, processing speed, cognitive function, and manual dexterity. In Dr. Massari's opinion, Darryl will be a disabled worker.

Daniel Adler, M.D., a pediatric neurologist, offered opinions about the causes of Darryl's deficits. He opined to a reasonable degree of medical certainty that the deficits Darryl suffers were not caused by his prematurity, but were caused by a period of deprivation of oxygen to the brain due to the cord prolapse. Dr. Adler stated that, had Darryl been delivered by 11:05 p.m. (instead of the 11:42 p.m. delivery time), the neurological problems he now suffers would not exist. Specifically, Dr. Adler opined that the neurological problems Darryl experienced in his early life and continues to experience resulted from the abrupt loss of oxygen that occurred due to compression of the prolapsed umbilical cord.

Dr. Adler explained that Darryl did not have any of the complications that are associated with premature delivery and resulting deficits. These complications include massive hemorrhaging of blood into the brain; major infection of the blood; and complications to the bowel that can cause the bowel to burst. Darryl suffered a minor hemorrhage of blood into the brain that would not be associated with deficits; he did not have the other complications associated with prematurity. Also, he did not have the physical neurological symptoms associated with pre-term birth, namely, increased muscle tone, *i.e.*, stiffness. On the contrary, he had loose muscles, that is, low muscle tone. Because he was only 26 weeks, however, his brain was more likely to be damaged by reduced oxygen, *i.e.*, hypoxia, than would be a fetus in a later stage of development. Therefore, the hypoxia he suffered as a result of the prolapsed cord was more likely to cause brain damage in Darryl than in a fetus that was more developed. Dr. Adler's conclusion was that "the injury [that Darryl suffered to his brain] is not an injury associated with prematurity. The injury he has is an injury associated with lack of oxygen."

Richard Stokes, M.D., an obstetrician/gynecologist, testified for Darryl about the standard of care and breaches by UMMS agents, and also about causation of injuries. Dr. Stokes explained what is meant by "cord prolapse." He stated:

More than 99 times out of 100, certainly when the baby is head first, the cord is up in the womb. It is very rare for

the cord to be in front of the baby's head. Now, this cord wasn't just in front of the baby's head. As [Dr. Harman] said [in his report], it was way down here. [Pointing to a diagram]. This is called the cervix. So it had come all the way through the cervix and was, as [Dr. Harman] said, 'a few millimeters from the vagina. . . . When [Ms. Player] has contractions, this is going to bulge out and impact the exam since she had [a] bulging bag of water. . . . [Y]ou can see where there's no cervix. When it bulges, it's bulging into the vagina. There's no place else for it to bulge. And, if the cord is here, when it bulges the cord is bulging into the vagina too.

Dr. Stokes testified that he agreed with Dr. Harman's assessment that the cord prolapse in this situation was dangerous and potentially life-threatening.

Dr. Stokes opined that, on the afternoon of September 19, 2002, the UMMS health care providers breached the standard of care by failing to properly examine Ms. Player to detect the signs of an infection and to diagnose that she in fact had an infection in her uterus that required a delivery by 5:00 p.m., which was shortly after the infection should have been discovered. He opined that there were signs of infection present that afternoon. He was not of the view that the infection caused any of Darryl's deficits. Rather, on breach of the standard of care issue, he merely opined that the delivery should have been performed by 5:00 p.m., because by then the doctors involved in Ms. Player's care should have determined that she had an infection that necessitated delivery; and if delivery had happened then, the injuries caused later that night by the cord prolapse would not have happened.

Dr. Stokes further opined that, when the very signs that Dr. Harman had warned were likely to happen and should be monitored did happen, the UMMS health care providers did not conform to the standard of care by performing a "stat" emergency cesarean section, that is one performed within "ten minutes." The ominous signs began at 10:15 p.m., when Ms. Player was experiencing contractions and reported what she felt was leaking water. The signs continued for the next half

hour, during which a fetal monitor reading showed "big" variable decelerations in the fetal heartbeat, followed by a positive test at 10:45 p.m. showing that the membranes had ruptured. Dr. Stokes opined that the standard of care at that point required a "stat" cesarean section, as the variable decelerations showed that the fetus was in distress, and that "stat" means urgent, again, no more than 10 minutes. Giving time for Dr. Alger to prep for surgery, a stat cesarean section should have been performed and delivery completed by 11:05 p.m. Instead, Darryl was not delivered until 11:42 p.m.

Dr. Stokes explained that, given the cord prolapse, with each contraction, the blood flow through the cord stopped, reducing the blood flow to the fetus, and thus depriving the fetus of oxygen. Dr. Stokes opined that, if the stat cesarean section had been called at 10:45 p.m., *i.e.*, meaning that Darryl would have been delivered by 11:05 p.m., Darryl would not have suffered hypoxic brain injury. He stated that Darryl's blood gases showed an abnormal pH (a measure of acidity in the blood), "indicative of a baby that was significantly depressed and stayed that way for a long period of time." He explained, "When I say 'long,' I mean half an hour"; the blood gases also showed a significant base deficit.

Dr. Stokes opined that Darryl's condition at birth in this case was "completely abnormal for premies." A premature infant delivered at 26 weeks would not have abnormal acid and base counts as in this case and would not have an Apgar score of 1 at one minute. Dr. Stokes further opined that a baby delivered at 26 weeks has about a 20% chance of suffering from neurological damage.

On the issue of breach of the standard of care and causation of injury, Darryl's last expert witness was Dr. Crawford who, as noted, is a neonatologist. Dr. Crawford opined, as had Dr. Stokes, that, had Darryl been delivered by 11:05 p.m. on the night in question, he "probably" would be "a normal child." She was asked: "As a result of [Darryl's] not being born [by 11:05 p.m.] and going through the repeated variable decelera-

tions, etcetera, what do you believe happened to Darryl with reasonable medical certainty?" Dr. Crawford responded:

I believe that Darryl suffered the effects of repetitive, meaning more than 50 percent of the time that he had that there were repetitive variable decelerations because of cord compression. The cord ... presentation that Darryl had was unusual, and that was pointed out by Dr. Harmon (sic). He said—because almost all of Darryl's umbilical cord was down in the ... endocervical canal. It was not partially down. It was almost all of it was down, so that the cord came down and looped back up. So every time there was a contraction the cord was almost doubly compressed because there were two loops.

Dr. Crawford explained the "mechanism of injury that Darryl sustained" as follows. The umbilical cord contains blood vessels—a vein and two arteries—with the vein, which is thin, bringing oxygen-laden blood to the fetus and the arteries, which are thick, carrying blood away. The effect of Ms. Player's contractions on Darryl's prolapsed umbilical cord was that the thin vein bringing blood (and oxygen) to the fetus was compressed, so that blood was not entering, but the thick arteries, taking blood away from the fetus were not compressed. That caused a serious loss of blood volume, "like bleeding out. It's like losing blood." His blood loss was "acute," meaning that it was sudden, happening during "this labor and delivery process," not as a result of prematurity.

Dr. Crawford opined to a reasonable degree of medical certainty that Darryl suffered a hypoxic brain injury due to the continuing effects of the cord prolapse during the period of delay in delivery. She explained that his low blood volume and low blood pressure, due to the cord prolapse, deprived his brain of oxygen, *i.e.*, caused hypoxia, which damaged the grey matter of the brain, which affects muscle tone and development. Dr. Crawford opined that Darryl's condition at birth was not the result of injuries that could be expected to happen due to premature birth at 26 weeks and low birth weight. Damage to the grey matter of the brain requires "an extreme insult in terms of blood flow, in terms of profusion, in getting

oxygen and blood to the brain." "The kind of injury [Darryl] had is where you have this severe, um, loss of blood, loss of blood flow. That's what damages the deep grey matter."

Dr. Crawford also was asked: "Now, you've heard testimony that premies at 26 weeks, many of them do sustain injury without (inaudible). What is it about Darryl that you believe he would have been normal but for the deviations from the standard of care and the delay (inaudible)?" She stated: "It's not normal to lose what amounted to probably 40 to 50 percent of his blood volume. That's not normal. They transfused him ... with about 60 percent of his blood volume." Dr. Crawford testified that an Apgar score of 1 at one minute is "distinctly abnormal" for a 26 week old neonate and the fact that Darryl required "all out resuscitation" was abnormal for a premature baby of 26 weeks. Dr. Crawford further opined that the type of brain damage that can result from prematurity alone is to the white matter of the brain—not the grey matter, which is the injury that Darryl suffered.

With regard to statistics about babies born prematurely at 26 weeks, Dr. Crawford stated that, for those babies born at a Level 3 hospital, meaning one such as UMMS with facilities for high risk pregnancies and deliveries and with NICUs, the death rate is about 18%. She agreed with the testimony by Dr. Stokes that, of the premature babies who are born at 26 weeks and survive, about 2 out of 3 will not have any significant deficits. She emphasized that those who do survive and suffer significant neurological problems do not have the kind of problems that Darryl has; they have a different constellation of problems that is caused by damage to the white matter of the brain, not the grey matter.

In support of its contention that the evidence adduced at trial was legally insufficient to support a finding by a preponderance of the evidence in favor of Darryl on the causation of injury element of the tort of medical negligence, UMMS argues as follows. First, it maintains that the expert opinion evidence about causation in fact, i.e., that the delay in delivery caused Darryl's deficits, was speculative in that it ignored the

"objective" statistical fact that babies born prematurely at 26 weeks and at a very low birth weight are likely to suffer damage to their brains, resulting in deficits. Specifically, it asserts that Darryl's expert witnesses "arbitrarily speculated" that he did not suffer brain injury as a result of extreme prematurity and instead, without any basis in fact and despite "overwhelming objective evidence" showing that Darryl's impairments resulted from his birth at only 26 weeks and low birth weight, opined that the deficits Darryl suffers were the result of the delay in delivery.

Second, UMMS argues that Darryl's expert witnesses did not present legally sufficient opinion testimony that the impairments he suffers were caused by hypoxia, that is, decrease in oxygen to the brain during the delivery process; and that is the case because symptoms ordinarily associated with a brain injury of that sort were not present here: his oxygen levels were 95% at birth; he did not sustain damage to other organs; he has had no subsequent history of seizures or encephalopathy; he had acceptable levels of acid in his blood after birth; after the one minute Apgar score, his scores quickly recovered; and he now is performing well in school.

We agree with the trial judge's assessment, in denying the motion for judgment at the conclusion of the evidence and the subsequently filed motion for JNOV, that this case presented a classic battle of the experts, and that there was sufficient evidence to submit to the jury, as the finder of fact, the question whether the impairments Darryl suffers were caused in fact by the negligence of the UMMS health care providers in not delivering Darryl at or before 11:05 p.m., or by his prematurity and low birth weight. The experts called by Darryl, whose testimony we have summarized above, were not basing their opinions on guesswork or conjecture. They were familiar by training and experience with the types of brain injuries and deficits that grossly premature and low birth weight babies can experience as a consequence of their prematurity and weight; and also were familiar by training and experience with the kind of injury that results from an

acute episode of hypoxia caused by cord prolapse during labor. They explained the mechanism of the latter injury, and why Darryl's condition upon birth and the location of his brain injury—within the grey matter—showed that acute hypoxia, not premature development and delivery, was the cause-in-fact of Darryl's deficits. To be sure, UMMS presented expert witnesses with contrary views, and a reasonable jury could have credited those views. The point, however, was that there was sufficient evidence from Darryl's expert witnesses to make the mechanism of injury, that is, the question of causation in fact, an issue for the jury to decide. If Darryl's expert witness evidence was credited, reasonable jurors could find by a preponderance of the evidence that his injuries resulted from the delay in delivery and the cord prolapse condition that existed during that period of delay.

There was evidence at trial that babies born at 26 weeks often will suffer brain injuries, simply due to prematurity and low birth weight. Darryl's expert witnesses acknowledged that in a setting such as UMMS, 18% of babies born at 26 weeks will die. Certainly, the likelihood of death was extremely high, if not close to certain, if Ms. Player's pregnancy had not been prolonged from 23 to 26 weeks. Darryl's expert witnesses also pointed out, however, that of the babies who are born at 26 weeks and do not die, approximately two out of three will not suffer serious neurological problems. The expert testimony was sufficient to show that Darryl's neurological problems were serious, however, and, as we have said, were not of the sort caused by prematurity. For example, Darryl did not suffer the serious level of bleeding into the brain seen in premature babies with serious deficits. Rather, he experienced a mild bleed, not usually associate with such deficits. The evidence as opined by Drs. Stokes and Crawford was sufficient to make the issue of cause in fact a jury question. Accordingly, the trial court did not err in denying UMMS's motion for judgment at the close of the evidence, or motion for JNOV, made on the ground of legally insufficient evidence of cause-in-fact.

UMMS's second causation argument concerns "legal cause" or what is more often referred to as proximate cause. UMMS asserts that, for policy reasons, a reasonable fact-finder should not have been permitted on the evidence presented to find that Darryl's injuries were caused by the breach (or breaches) of the standard of care by its agents because UMMS's agents saved his life by rendering care that extended the pregnancy from 23 weeks to 26 weeks; his deficits were typical of premature infants born at 26 weeks and weighing less than 2 pounds; and he was the beneficiary of excellent newborn pediatric care in the UMMS NICU.

This argument in part overlaps with the one that precedes it. Again, it was for the jury to decide, based on the conflicting expert witness evidence presented at trial, whether Darryl's deficits were caused by negligent delay in delivering him or by the mere fact of prematurity and associated low birth weight. The jury's verdict makes plain that it decided the former, and rejected the latter. Whether other reasonable jurors could have reached the contrary decision, or whether any of the members of this panel of judges would reach a contrary decision, is irrelevant. The question was for the jury to decide, and it did.

The legal causation argument being advanced seems to advocate in favor of a stricter standard of proof in medical malpractice cases when an underlying condition of the patient was being successfully treated, so that the patient's life was extended and he was saved from death, and when the condition that brought the patient to care itself poses serious risks to the patient's health, including death. The argument is that the health care providers should be protected from liability when their efforts were at some point life-saving. It is often the situation in medical malpractice cases, however, that the reason the patient comes under the care of a health care provider is because the patient is suffering a serious, if not life threatening, condition or illness; and that the health care provider is successful in much of the treatment rendered, even to the point of saving the patient's life.

Nevertheless, if within the course of treatment, even life-saving treatment, the health care provider commits a breach in the standard of care that is the cause-in-fact of an injury to the patient, the health care provider will be liable in damages for negligence, based upon the elements of a cause of action for negligence and subject to the same standard of proof (preponderance of the evidence) that applies generally to negligence actions and most civil actions. Under Maryland tort law, a health care provider treating a patient is under a legal duty to do so within the standard of care throughout the period of treatment; that does not change because some aspects of the treatment rendered to the patient have been successful, even heroic. Here, once the treatment by UMMS health care providers removed the virtual certainty of death Darryl faced had he been born at 23 weeks, they remained obligated to adhere to the standard of care in their treatment of him (and of his mother) throughout the continuation of her pregnancy through delivery (and after, until Darryl was no longer in their care). The jury probably appreciated that the UMMS health care providers saved Darryl's life by extending the pregnancy from 23 to 26 weeks. The jury also appreciated, however, as its verdict reflects, that when Darryl was a 26–week fetus and a potentially life-threatening cord prolapse was discovered, the health care providers did not adhere to the standard of care in delivering him, thus causing his injuries. The excellent care on the front end of the hospital admission does not negate the breach in the standard of care at the time of delivery.

Certainly, it was reasonably foreseeable that Darryl would sustain injuries, if not death, if his delivery was not quickly accomplished once certain signs became evident—as Dr. Harman warned. This was not a situation that would fail the foreseeability component of causation. *See Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (N.Y.1928). And to the extent that some might advocate that good social policy favors a higher level of proof in medical malpractice cases in which patients present in dire, life-threatening situations that are properly controlled, only to be injured by

breaches in other aspects of their care, that is not a question for this Court to delve into. It is a quintessentially legislative issue, as there are others who might strongly advocate precisely the opposite.

There was sufficient evidence adduced to show that the breaches of the standard of care by UMMS caused the injuries that Darryl sustained. Therefore, the trial court's decision to deny the motion for judgment and motion for JNOV will not be disturbed.

## II.

### *Sufficiency of Evidence of Future Lost Wages*

UMMS's second contention is that the evidence was legally insufficient to support a reasonable finding that Darryl will incur future lost wages. Darryl responds that this issue is not preserved for review on appeal and lacks merit in any event. We agree with Darryl on both points.

The first time UMMS raised the issue of future lost wages was in its motion for new trial. UMMS did not argue in the motion for judgment at the close of the evidence (or in the motion for judgment at the close of Darryl's case, which UMMS's counsel incorporated into his motion at the conclusion of the evidence) that the evidence adduced was legally insufficient to show that Darryl would sustain lost wages in the future as a consequence of the injuries he suffered around the time of his birth due to breaches of the standard of care by UMMS's agents; nor was that argued in its motion for JNOV. And, in any event, an argument on the sufficiency of the evidence not made during trial by means of a motion for judgment cannot be raised in a motion for JNOV. Md. Rule 2–532(a) ("In a jury trial, a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion.").

Even if the legal sufficiency issue were preserved for review, we would not find merit in it. Dr. Massari testified

that Darryl's deficits will limit his ability to work in jobs suitable to the education he likely will be able to attain, thus resulting in his being a disabled worker. Mr. Shedlin testified that, given that Ms. Player is college-educated and not disabled, more likely than not, had Darryl not sustained the impairments resulting from his delayed delivery, he would have graduated from college and had the earning capacity of a male college graduate. With his impairments, it is unlikely that Darryl will be able to attend college; and, although he probably will graduate from high school, he will not have the earning capacity of a male high school graduate who does not have the physical and cognitive impairments he does. Mr. Shedlin was able to offer expert testimony about average earnings and a comparison of the amount of future earnings that Darryl will not enjoy due to his disabilities. On this evidence, reasonable jurors could find, by a preponderance of the evidence, that Darryl has sustained future lost wages due to the breaches in the standard of care by UMMS agents.

Finally, as mentioned above, the standard of review of a motion for new trial is abuse of discretion. Abuse of discretion is a highly deferential standard. We cannot say, given the evidence adduced at trial that supports a reasonable finding of future lost wages, that the trial court abused its discretion in denying a new trial based upon the jury's award of future lost wages to Darryl.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**