*Osiris Holding of Maryland LLC, et al. v. Daniels*, No. 1774, September Term, 2023.
Opinion by Graeff, J.

**NEGLIGENCE—DISINTERMENT—STANDARD OF CARE**

A cemetery has a duty of care in disinterring or otherwise handling a dead body. Although expert testimony may be required in a negligence suit against a cemetery, it was not required in this case. Industry standards can be admitted to show the applicable standard of care in a negligence cause of action, and in this case, Mrs. Daniels presented evidence that the industry standard is to have a mortician present at a disinterment, and if the outer burial container ("OBC") becomes compromised before it is removed from the ground, the mortician should transfer the remains to a new OBC. Based on this evidence, a reasonable fact finder could determine that the applicable standard of care owed by Osiris during the disinterment was to have a mortician present, and once the lid cracked and the OBC became compromised, the mortician present should have moved Mr. Daniels' remains from the compromised OBC to the new OBC before continuing to bring Mr. Daniels' remains out of the grave.

Based on the evidence presented, and the inferences that could be drawn from that evidence, a reasonable fact finder could determine that Osiris breached its duty to exercise reasonable care by failing to have a mortician present to transfer Mr. Daniels' remains to a new OBC when the OBC in which he was buried became compromised.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1774

September Term, 2023

_____

OSIRIS HOLDING OF MARYLAND, LLC,
ET AL.

v.

PATRICIA DANIELS

_____

Graeff,
Arthur,
Battaglia, Lynne A.
　(Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Graeff, J.

_____

Filed: January 30, 2025

* Albright, J., did not participate in the Court's
decision to designate this opinion for publication
pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Appellants, Osiris Holding of Maryland, LLC, and Osiris Holding of Maryland Subsidiary, Inc. ("Osiris" or "appellants"), challenge a judgment entered against them in the Circuit Court for Prince George's County, holding them liable to Patricia Daniels, appellee, for negligence in the disinterment of Gregory Daniels, her son, from Lincoln Memorial Cemetery ("Lincoln Memorial" or "the cemetery").[1] The jury awarded Mrs. Daniels $3,040 in expenses and $357,000 in noneconomic damages.

On appeal, Osiris presents two questions for this Court's review,[2] which we have combined into the following question:

> Did the trial court err in denying Osiris' motions for judgment and allowing the jury to decide whether its conduct during the disinterment of Mr. Daniels was negligent?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

---

[1] The record reflects that appellants were the two entities that operated the cemetery.

[2] Osiris presented the following questions on appeal:

> 1. Whether, under the circumstances, expert testimony was required to have been presented by Appellee at trial to establish a standard of care and breach of that standard of care pertaining to the operation and conduct of a disinterment at a cemetery?

> 2. Whether Appellee presented any evidence at trial that gave rise to a permissible inference that the Appellees were negligent to permit the issue of negligence to be determined by the jury?

FACTUAL AND PROCEDURAL BACKGROUND

## I.

### Mr. Daniels' Burial at Lincoln Memorial

Mr. Daniels passed away on September 6, 2016. His mother, Mrs. Daniels, arranged for him to be buried "as a Muslim" in the family plot at Lincoln Memorial. At the time of his death, Mr. Daniels was a practicing Muslim.

There was evidence presented that Muslim burial practices have distinctive features. In a non-Muslim burial, the decedent's remains typically are placed into a casket or coffin. The casket or coffin is placed into an outer burial container ("OBC"), which is then buried in the gravesite.[3] In a Muslim burial, by contrast, the decedent's remains are wrapped and shrouded in cloth, and the remains are placed directly into an OBC, not into a casket or coffin. A lid is then placed on the top of the OBC, and the OBC containing the remains is then buried in the gravesite.

On September 7, 2016, Mr. Daniels' funeral and burial occurred at Lincoln Memorial. Charles Smith, general manager for Lincoln Memorial, testified regarding protocols to identify a gravesite location. When contacted, they would look for the lot card with the name of the person with a lot, here Patricia Daniels, and mark the gravesite. They would then take the family to the site to verify that it is the site where their loved one was

---

[3] The outer burial container ("OBC") that initially held Mr. Daniels' remains and was subsequently buried in the ground is referred to by multiple other names throughout the record. Mrs. Daniels referred to the container as a "vault." Osiris, through counsel and one witness, referred to the container as a "grave liner." For purposes of clarity, we refer to the container used in this case as an OBC.

to be buried.  Mrs. Daniels did not personally verify the site; she sent her granddaughter to do that.

Mr. Daniels' OBC had been pre-installed in his burial plot.  It was made of cement that was not reinforced with any kind of material, and its lid was not sealed to its base.

## II.

## Disinterment from Lincoln Memorial

In April 2017, Mrs. Daniels received a call from Shante Brown, a representative of Lincoln Memorial, advising her that Mr. Daniels had been interred in the wrong burial plot.[4]  Ms. Brown told Mrs. Daniels that Lincoln Memorial could disinter Mr. Daniels and reinter him into the correct plot.  To do so, however, Mrs. Daniels would need to sign a release of liability for burying her son in the wrong plot.  Mrs. Daniels refused to sign a release of liability.  Mrs. Daniels testified that Lincoln Memorial staff subsequently began harassing her about removing Mr. Daniels from the burial plot, stating that Lincoln Memorial would remove Mr. Daniels from the plot with or without her permission.

Mrs. Daniels then decided to move her son's remains from Lincoln Memorial to a Muslim cemetery, Al-Firdaus Memorial Gardens ("Al-Firdaus").[5]  Lincoln Memorial told

---

[4]  Mr. Smith testified that they realized they had lot cards for two people named Patricia Daniels after the other Patricia Daniels passed.  When they pulled the lot card for her, they realized that the plot for Mr. Daniels was incorrect.

[5]  Mrs. Daniels identified this cemetery as "Waqk [sic] of Maryland," and her daughter, Tamara Daniels, identified it as "Al-Firdaus Walk of Maryland."  In Plaintiff's Exhibit 6, attached to Plaintiff's response to Defendant's motion for summary judgment, the cemetery is identified as "Al Firdaus Memorial Gardens."  The cemetery's website states that its name is "Al-Firdaus Memorial Gardens."  *Home,* Al-Firdaus Memorial

3

her that they redid the authorization form, but when she went to sign, it had the same release language, which she refused to sign. She was then told to get authorization from the State's Attorney's Office to remove the remains, which she did. Lincoln Memorial told Mrs. Daniels that she could take possession of Mr. Daniels' remains at 10:00 a.m. on July 5, 2017, but she was not required to be present at the disinterment.

On July 5, 2017 at 10:00 a.m., Mrs. Daniels, her daughter, and her granddaughter arrived at Lincoln Memorial to take possession of Mr. Daniels' remains. Two representatives from Al-Firdaus, a mortician and a transporter, arrived shortly thereafter.[6] The group planned to take possession of Mr. Daniels' remains, transport them to Al-Firdaus, and reinter them there. A mortician is required to be at a disinterment because, if human remains must be moved, transported, or handled in any way, only a mortician may do so.

Upon their arrival, Ms. Brown informed the group that Mr. Daniels' remains were not ready to be picked up because the cemetery operators had just begun the disinterment process.[7] Mrs. Daniels asked Ms. Brown why an OBC was sitting next to Mr. Daniels'

---

Gardens, https://www.islamicwaqfofmd.org/home, available at https://perma.cc/Q8X9-APW3 (last visited Jan. 10, 2025).

[6] A mortician is a licensed professional who must pass "the national board examination administered by the Conference of Funeral Service Examining Boards of the United States" to qualify for a mortician's license. Md. Code Ann., Health Occ. ("HO") § 7-303(b)(4) (2021 Repl. Vol.)

[7] A cemetery operator is a person whose job includes burials, disinterments, and reinterments. A cemetery operator is not authorized to handle human remains. Throughout the record, cemetery operators are referred to by different names, including "cemetery

grave. Ms. Brown stated that a funeral was scheduled to occur after Mr. Daniels' disinterment. The family left the gravesite and walked to their car to wait for the disinterment to be completed.

Approximately one hour later, the family walked back to Mr. Daniels' gravesite to check on the progress of the disinterment. One of the cemetery operators said that they had cracked the OBC's lid and needed to put another lid on it. Mrs. Daniels asked them not to remove the lid unless it was absolutely necessary because her son was not in a casket, and she did not want to further disturb him. A cemetery representative advised that, to take the OBC with a cracked top, Mrs. Daniels needed to sign a release form. Ms. Brown advised that Mrs. Daniels had not signed the release form for the disinterment. The cemetery operators then attempted to raise the OBC with the cracked lid out of the ground. Mrs. Daniels testified that they may have been planning to put another lid on after they brought it ground level, but as they were removing the OBC, it fell and the cracked lid "slid off to one side." Mrs. Daniels saw her "son's head hanging" and began to scream. Mrs. Daniels and her daughter walked away from the gravesite, but Mrs. Daniels' granddaughter remained.

After another hour, Mrs. Daniels and her daughter returned to the gravesite. They returned after Mrs. Daniels' granddaughter started walking toward them, and the cemetery operators motioned for Mrs. Daniels to come over, stating that they had put the top on. The cemetery operators again attempted to lift the OBC out of the ground. This time, the OBC

___

operator," "grave digger," "cemetery staff," and "staff." For purposes of clarity, we refer to these individuals as "cemetery operators."

5

lid came off, and the OBC fell back into the freshly excavated hole.  Mrs. Daniels testified that the OBC fell with so much force that her son's body "pop[ped] in the air," and his remains then came back down and "partially spilled on the ground."  She screamed, walked away, and then saw the mortician from Lincoln Memorial arrive and yell at the cemetery operators, "telling them that they were so stupid, they couldn't do anything right."  One of the cemetery operators then "got a shovel and picked [her] son up like he was roadkill and put him in" the broken OBC.  A cemetery operator then used the backhoe to flip the OBC "right side up" and lift it to ground level.  Once the OBC was on ground level, the mortician and her assistant put Mr. Daniels' remains in a body bag and "slung him in the new [OBC] like he was a sack of potatoes."[8]  The new OBC was at the gravesite when they arrived. They put a new top on and placed the OBC next to the Al-Firdaus transport truck.

Mrs. Daniels and her daughter both testified that a mortician arrived only after Mr. Daniels' remains spilled out of the OBC and into the burial plot.  Evidence was presented that Maryland state law requires a mortician be present during a disinterment because only morticians are allowed to touch or handle human remains.[9]

---

[8]  Mrs. Daniels had brought a mortician with her, but it took hours to obtain Mr. Daniels' remains, and that mortician had to leave for another engagement.

[9]  At oral argument, counsel for Mrs. Daniels stated that it was an industry standard as opposed to a state law.

## Court Proceedings

On September 9, 2019, Mrs. Daniels filed a complaint, alleging breach of contract, negligence, intentional infliction of emotional distress, and unfair and deceptive trade practices in violation of the Maryland Consumer Protection Act. As relevant to the issue on appeal, Mrs. Daniels argued that Osiris breached its duty to her by failing to properly disinter Mr. Daniels' remains and being "careless, reckless, and/or negligent" in handling Mr. Daniels' remains. Osiris filed an answer, denying all liability.

### A.

### Expert Witness Designation

On June 19, 2020, Mrs. Daniels filed a Designation of Experts. She listed Dan Rohling, Certified Funeral Service Practitioner ("CFSP"), as a witness who would "testify as to his opinions regarding the handling and disinterment" of Mr. Daniels' remains.[10] Mrs. Daniels stated that Mr. Rohling's opinions would be based on his review of the documentation and other evidence in the case "and his experience and expertise in the field of funerary practices and mortuary and cemetery operations."

---

[10] The Academy of Professional Funeral Service Practice discusses on its website, https://www.apfsp.org, the qualifying activities necessary to obtain the designation of Certified Funeral Service Practitioner. *Steps to Earning the CFSP Designation*, Academy of Professional Funeral Service Practice, https://www.apfsp.org/steps-to-earning-the-cfsp, available at https://perma.cc/D5Y9-XGKY (last visited Jan. 10, 2025).

**B.**

**Motion in Limine**

On February 3, 2023, Osiris filed a Motion in Limine to Exclude De Bene Esse Deposition Testimony of Dan Rohling at Trial. They argued that Mr. Rohling lacked the "necessary skill, knowledge, education, training or experience required pursuant to Md. Rule 5-702(1) to offer an expert opinion in the area of disinterment." Moreover, they asserted that he failed to satisfy Md. Rule 5-702(3) because his opinion was "not supported by a sufficient factual basis" or "based on any generally accepted methodology or standard in the disinterment field," but instead, Mr. Rohling's opinion was based on "common sense." In support, it pointed to the following exchange that occurred during Mr. Rohling's deposition:

> [Counsel for Osiris:] I think your –ultimately your conclusion that once the lid popped off that there should have been, sort of a, reset in terms of the removal of - of the burial container and the decedent's remains. Is that based on any specific state or national statutes or regulations, or based on any specific standards in the industry that one can look at?
>
> [Mr. Rohling:] No. It's based on common sense and the practicality as you're making the exhumation.

On February 7, 2023, Mrs. Daniels filed a motion in opposition, arguing that Mr. Rohling qualified as an expert under Md. Rule 5-702(1), and his opinions satisfied Md. Rule 5-702(3) because they were based on industry standards. Mrs. Daniels asserted that "the funeral industry is not based on science in the same way as the medical profession and, instead, industry standards are mostly learned on the job." She argued that, during his deposition, Mr. Rohling discussed industry standards for disinterments "that were in line

8

with the same industry standards" discussed by Osiris' witness, Alan Davis, and therefore, Mr. Rohling's opinions were "based on industry standards."

On April 19, 2023, after a hearing, the court granted Osiris' motion. In assessing whether Mr. Rohling could testify as an expert in the standard of care in performing a disinterment, the court stated that he qualified as an expert by his skill, experience, training, and education under Maryland Rule 5-702(1). It ruled, however, that his proposed testimony did "not satisfy Maryland Rule 5-702(3), as his opinions [were] not founded upon a sufficient factual basis." Instead, Mr. Rohling's opinions were based on "common sense," a standard that does not "require an expert to testify" because "a fact finder may themselves possess it."[11] The court stated that "[a]n opinion based on common sense would not give the jury 'assistance in solving a problem for which their equipment of average knowledge is inadequate.'" (quoting *Radman v. Harold*, 279 Md. 167, 169 (1977)). Accordingly, the court ruled that the Bene De Esse Deposition Testimony of Mr. Rohling be excluded at trial.

## C.

### Osiris' Motion for Summary Judgment

On May 3, 2023, Osiris filed a motion for summary judgment on the negligence claim, arguing that they were entitled to judgment as a matter of law because Mrs. Daniels had no expert who could "establish the applicable standard of care owed by [Osiris] in

---

[11] The court pointed to the same exchange cited by Osiris in its motion.

disinterring human remains."[12]   Mrs. Daniels opposed the motion, arguing that expert testimony was not required to establish a standard of care because the cemetery industry is not a specialized profession, and therefore, the average layperson could understand both "the concept of a disinterment" and that "precautions should be taken to ensure" that a disinterment is conducted respectfully.  On May 22, 2023, the court denied Osiris' motion for summary judgment.

## D.

## Trial

On September 18, 2023, a three-day jury trial began.  Mrs. Daniels testified regarding the death of her son and her arrangement for him to "be buried as a Muslim without a casket" in the family burial plot at Lincoln Memorial.  Mrs. Daniels then testified, as discussed *supra*, to the events that occurred in April 2017, after Lincoln Memorial advised her that her son had been interred in the wrong burial plot.

After recounting what happened during the disinterment, Mrs. Daniels identified and explained several pictures taken by her granddaughter during Osiris' "second attempt" to remove the OBC from Mr. Daniels' burial plot.  She described Exhibit Six as showing the "top to the [OBC] broken in pieces and the [OBC] toppled over."  Exhibit 21 showed the cemetery operators lifting Mr. Daniels' OBC from the burial plot after his remains spilled out of the OBC and were placed back inside.  The photograph reflects that there is no lid on top of the OBC, and Mr. Daniels' remains are visible.  Exhibit 15 demonstrated

---

[12] The court previously had denied Osiris' motion for summary judgment on the other counts.

"the debris and the dug out hole." Other photographs submitted into evidence show the OBC turned on its side while Mr. Daniels' remains were spilled out into the burial plot, as well as photographs showing cemetery operators standing on top of the broken OBC while Mr. Daniels' remains were spilled out into the burial plot.

At the conclusion of her testimony, Mrs. Daniels stated that the disinterment had affected her "whole life," stating that she became very depressed, began isolating herself, and began having terrible nightmares. When asked whether anyone at the gravesite had warned her "of any dangerous conditions or to stay back from the grave," she replied: "No, they did not."

Mrs. Daniels' daughter, Tamara Daniels, also was present for Mr. Daniels' disinterment. The family was told that they would be able to take possession of Mr. Daniels' remains on July 5, 2017 at 10:00 a.m., to take them to a new cemetery. When they arrived, however, they were told that the disinterment had started late "because of the Fourth of July holiday." The family went to wait in their car.

After approximately one hour, the family exited their car and walked over to Mr. Daniels' gravesite to check on the progress of the disinterment. Shortly after the family arrived at the gravesite, the cemetery operators "attempted to lift" the OBC out of the burial plot, but the OBC's lid "slid to one side," and they dropped the OBC. Ms. Daniels saw Mr. Daniels' "head leaning in his chest," and her mother "hollered." Ms. Daniels and her mother then returned to their car.

11

Approximately thirty minutes later, they exited their car when they saw Mrs. Daniels' granddaughter walking toward them. At that time, two cemetery operators motioned to the family and said "we got the top on."

The family walked back to Mr. Daniels' burial site, and they observed the cemetery operators again attempt to lift the OBC from the burial plot. While the OBC was "in mid-air, the top fell off." The OBC "tilted slightly and [her] brother's head curled forward and then suddenly jerked back all while his remains remained in the [OBC]." After the OBC and Mr. Daniels' remains "simultaneously hit the ground of the open grave," his "remains popped up out of the [OBC] and fell back down." The OBC "toppled over," and Mr. Daniels' remains "spilled on the ground." Mrs. Daniels "yelled and screamed" at Ms. Brown and the other cemetery representative, stating: "Look what you did to my son." In response, they "stood there stone cold."

The cemetery operators then "scooped" Mr. Daniels' remains back into the damaged OBC and raised the OBC and Mr. Daniels' remains to level ground. Two morticians, who arrived after Mr. Daniels' "remains were spilled on the ground," removed his remains from the OBC, "wrapped [the] remains in a body bag," and placed them in a new OBC, which was located at the gravesite. Ms. Daniels testified that "the female mortician was rude, impatient and complained that they had to recover [Mr. Daniels'] remains from the ground."

Counsel for Mrs. Daniels then read into evidence the deposition testimony of Allen Davis. At the time the deposition was taken, Mr. Davis was the general manager of the Cedar Hill cluster of cemeteries, which included Lincoln Memorial.

Mr. Davis testified about the general standards governing cemetery operations. He stated that the Office of Cemetery Oversight ("OCO") had published professional standards governing cemetery operators in Maryland. Those standards included: (A)(1): "Act in a manner that respects and protects the dignity of the decedent and the decedent's family" and "A(8): Be sensitive and responsive to bereavement needs of a decedent's family."

Mr. Davis testified about the process and procedures associated with a disinterment. He explained that, if a disinterment becomes necessary, the cemetery provides all personnel and equipment, including a mortician. He testified that state law requires that a mortician be present at a disinterment.[13] The mortician must be present throughout the disinterment process, from the opening of the grave until "the body is pulled out of the ground."

Mr. Davis reviewed pictures taken during the disinterment, and they indicated that Mr. Daniels' OBC was compromised during the disinterment process. He testified that there is a high probability that the OBC will break during a disinterment because there are six tons of pressure on the OBC after it enters the ground, "and the pressure is not simply from above," but it is also from the sides. Moreover, "depending upon the length of time" that the OBC "is in the ground, it may degrade." Mr. Davis stated that "any time you open the grave, and once again, this is industry-wide, with sharp and heavy equipment," there is a high probability that the OBC will break. Because of the probability that an OBC will break during a disinterment, the policy in the industry is to have another OBC present.

---

[13] Mr. Davis testified that state law requires that a licensed funeral director be present during a disinterment, and Mr. Smith clarified that a funeral director is a mortician.

13

If an OBC becomes compromised prior to "getting it out of the ground," the casket should be placed into the new OBC, which is "standing by." Mr. Davis testified that, in a Muslim burial with no casket, as in this case, "someone would have had to have gone in there, picked up -- picked the individual up out of the outer burial container, and placed him in another outer burial container."

Mr. Davis had never been involved in a disinterment where the remains partially or wholly spilled from the OBC, but he stated that in every disinterment he had done, the remains were in a casket. When asked whether he would acknowledge that what happened during Mr. Daniels' disinterment was "not what is supposed to happen as far as spilling the remains either partially or wholly out of the" OBC, Mr. Davis replied that every precaution is taken "to ensure that the disinterment is done properly and respectfully and that would preclude having remains spill." He stated that every precaution is taken "to make sure that mistakes are not made, but sometimes mistakes are made."

At the end of Mrs. Daniels' case-in-chief, Osiris orally moved for judgment on all of Mrs. Daniels' claims. With respect to Mrs. Daniels' negligence claim, Osiris argued that the evidence Mrs. Daniels presented failed to demonstrate a breach of duty or causation. With respect to a showing of a breach of duty, counsel argued:

> [W]hen you're talking about disinterment process and cemetery practices, you have to have in evidence to say they used the wrong container. They hooked it up incorrectly. They should have stopped when this happened. If the mortician had been present A, B, and C should have occurred. There's no evidence like that. The jury is simply left to speculate as to what happened and how that would be negligent.

14

Counsel further argued that there was no evidence that negligence caused any of Mrs. Daniels' injuries. Counsel stated that, even if a mortician was supposed to be there the whole time, "what would have happened differently if the mortician had been present? It would be one thing to either have . . . an expert say, well, if a mortician had been present A, B, and C could have happened."[14]

The court denied the motion regarding the negligence claim, stating that sufficient evidence existed for the jury to determine, as questions of fact, "whether there was actually a duty, a breach, and damages." The court granted judgment in favor of Osiris, however, on the claims for breach of contract, violation of the Maryland Consumer Protection Act, and intentional infliction of emotional distress.

Osiris called Charles Smith, the general manager of Lincoln Memorial at the time, as its first witness. Mr. Smith explained the standard procedures used by Lincoln Memorial during a disinterment. These procedures remained the same regardless of the decedent's religion. It was "standard operating procedure" to remove the OBC from the grave with the remains inside of it. Cemetery operators do not remove the body from the OBC prior to the disinterment because only a mortician may do so. He stated that:

> The day of the disinterment, we get a . . . outer burial container that was chosen, we have one on standby. Then we start the disinterment process. Then we are required to make sure that there's a mortician on standby for the -- for once we pull the loved one from the specific site, if there's any issues in having to transfer it from one [OBC] to the other, that's when the [mortician] is there to help.

---

[14] Counsel for Mrs. Daniels argued that Mr. Davis testified that state law required that a mortician be present during the entire process of the disinterment, and they did not follow state law or their own practices in that regard.

15

It was not standard procedure to seal the OBC's lid onto its bottom.

Mr. Smith testified that Lincoln Memorial does not require family members to be present during a disinterment, but it does require a licensed mortician to be present. A mortician is required because, in the event that an OBC becomes compromised, the decedent must be transferred to a new OBC, and only a mortician is allowed to make the transfer. Although a disinterment is "not supposed to happen without a mortician," the mortician merely needs to be in the vicinity, not "standing there watching" the disinterment. The mortician does not direct the cemetery operators or "supervise the disinterment process." Morticians are responsible for handling the remains, and cemetery operators are responsible for interring and disinterring the remains.

Mr. Smith explained the standard procedures for handling a compromised OBC. When an OBC becomes compromised, it can no longer be used to transport the decedent, and the mortician transfers the decedent's remains to a new OBC. Cemetery policy is not to remove the body out of the OBC before the OBC is removed. Rather, the policy is that the OBC is removed, and the transfer of remains, if necessary, happens after the OBC is out of the ground. Mr. Smith testified that he had never experienced an OBC becoming so compromised that it could not be removed from the ground.

Sean Neely, the superintendent for Cedar Hills Cemetery, which included Lincoln Memorial, testified that his job included conducting burials and disinterments. During a disinterment, "hooks" and "big cables" are connected to the OBC. In this disinterment, five people, including the backhoe operator and himself, were involved. Mr. Neely was

16

not present for the entire three hours, but he was there "about ten minutes before [the OBC] fell down." He did not remember anyone waving the family over to the gravesite, noting that there would be no reason to wave them over. Any time family members are present for a disinterment, they "have to step back" from the gravesite because of the danger presented by the backhoe. In the event that family members refuse to step back from the area, the cemetery operators cannot continue to work.

At the conclusion of all the testimony, Osiris rested their case and again moved for judgment on the negligence claim. They argued that there was no evidence that the conduct during the disinterment violated any standards of care. The court denied the motion.

In her closing argument, counsel for Mrs. Daniels noted that Mr. Davis testified that state law required a mortician to be present during the process of a disinterment, including "when the body is pulled out of the ground," and "that did not happen." The mortician "had to be there and available," and she was not "until the very end after all of these mistakes were made." Counsel stated that "they had multiple opportunities during this time to stop what they were doing, find that mortician because nobody else could have moved those remains from that compromised outer burial container into the new outer burial container that they had waiting just for that purpose." Counsel further argued that the cemetery did not use the new OBC according to industry standards when the first one became compromised. Once the OBC became compromised, the remains should have been put into the new OBC, but nobody called the mortician, and instead, "[t]hey just kept trying." Counsel noted Mr. Davis' testimony regarding standards for a cemetery "regarding the treatment of families and the deceased," including "respect and protection

17

of the dignity of the decedent and the decedent's family." Counsel argued that the cemetery "failed to meet that standard."

Counsel for Osiris argued that, although the events were unfortunate, there was no evidence of negligence causing Mrs. Daniels' emotional distress. He stated that the mortician is there only in the event that the remains need to be transferred to a new OBC, not to supervise the disinterment. He argued that Mr. Smith testified, without contradiction, that the process was that the body is removed from a compromised OBC to a new one only after it is removed from the gravesite, and therefore, there was no evidence that something different would have happened if the mortician had been there earlier.[15] Moreover, counsel argued that there was no evidence that the operation at the disinterment was negligent. The mere fact that the container broke was not negligence.

The jury found that Osiris was negligent in how it conducted Mr. Daniels' disinterment. It further found that Mrs. Daniels did not assume the risk of her injuries.[16] The jury awarded Mrs. Daniels $3,040 in expenses and $357,000 in noneconomic damages.

---

[15] We note that Mr. Davis did contradict that testimony, indicating that in a situation where an OBC is compromised before it is removed from the grave, someone "would have had to have gone in there, picked up -- picked the individual up out of the outer burial container, and placed him in another outer burial container."

[16] The jury also found Osiris negligent when they buried Mr. Daniels in the wrong grave. They determined, however, that Mrs. Daniels was contributorily negligent, and therefore, she was not entitled to recovery on that claim.

## E.

## JNOV

On September 29, 2023, Osiris filed a Motion for Judgment Notwithstanding the Verdict ("JNOV") or, in the Alternative, Motion for a New Trial or Remittitur, arguing, in relevant part, that Mrs. Daniels had failed to present "expert testimony setting forth a standard of care for cemetery practices generally or disinterments specifically," and there was insufficient evidence to give rise to an inference that they had acted negligently during Mr. Daniels' disinterment. Mrs. Daniels opposed the motion, arguing that expert testimony was not required in this case, that Mr. Smith and Mr. Davis presented industry standards, and that sufficient evidence existed for a jury to determine that a breach of industry standards had occurred. She stated that it is within a lay person's ability to understand that during a disinterment, precautions should be taken to ensure that it is done in a safe and respectful manner. She asserted that,

> if a mortician had been present, the mortician would have been able to move the remains to the new outer burial container in keeping with industry standards when the outer burial container first became compromised when the lid broke, thus avoiding the ultimate dropping of the outer burial container back into the grave.

On October 25, 2023, the court denied Osiris' motion.

This appeal followed.

## STANDARD OF REVIEW

We review a trial court's decision to deny a motion for judgment or a motion for judgment notwithstanding the verdict ("JNOV") "to determine whether it was legally correct." *Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 503 (2011). We review

19

"without deference" the circuit court's decision, "while viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party[.]" *Thompson v. UBS Fin. Servs., Inc.*, 443 Md. 47, 56 (2015) (quoting *Scapa Dryer Fabrics, Inc.*, 418 Md. at 503).

"[W]hen a defendant moves for judgment based on ... the legal insufficiency of the plaintiff's evidence, the trial judge must determine if there is any evidence, no matter how slight, that is legally sufficient to generate a jury question[.]" *Webb v. Giant of Md., LLC*, 477 Md. 121, 136 (2021) (alterations in original) (quoting *Thomas v. Panco Mgmt. of Md., LLC*, 423 Md. 387, 394 (2011)). The legal sufficiency of the evidence in a civil case turns on whether, based on "the facts adduced at trial viewed most favorably to" the prevailing party, "any reasonable fact finder could find the existence of the elements of the cause of action by a preponderance of the evidence." *Marrick Homes LLC v. Rutkowski*, 232 Md. App. 689, 707-08 (2017) (quoting *Univ. of Md. Med. Sys. Corp. v. Gholston*, 203 Md. App. 321, 329 (2012)). If "there is legally sufficient evidence to support a finding in favor of the party bearing the burden of proof," the circuit court would be in error in granting a motion for judgment and withholding the case from the jury. *Id.* at 708 (quoting *Univ. of Md. Med. Sys. Corp.*, 203 Md. App. at 329). "We will reverse the denial of a motion for judgment notwithstanding the verdict 'only if the facts and circumstances permit but a single inference as relates to the appellate issue presented.'" *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 333 (quoting *Jones v. State*, 425 Md. 1, 31 (2012)), *on reconsideration in part*, 433 Md. 502 (2013).

20

## DISCUSSION

Appellants contend that the circuit court erred in failing to enter judgment in their favor because Mrs. Daniels presented no expert testimony relating to the standard of care, or any breach of such standard of care, relating to "the professional operation of regulated cemeteries in Maryland." They allege that expert testimony was necessary because disinterment involves processes or procedures beyond the knowledge of a trier of fact. Appellants argue that "the mere happening of an event is not in and of itself negligence," and Mrs. Daniels failed to present evidence that they breached any duty owed to her during the disinterment. They assert that "the record fails to support an inference permitting the theory of negligence to be submitted to the jury as a fact-finder."

Mrs. Daniels contends that the circuit court did not err in submitting the case to the jury because "there was more than sufficient evidence presented to give rise to a permissible inference that [appellants] were negligent." She argues that "the burial process itself – and by extension the disinterment process – is not so technical" as to require expert testimony regarding the applicable standard of care. She asserts that evidence of the applicable industry standards was presented by Mr. Smith and Mr. Davis, and there was sufficient evidence of a breach of these standards. Specifically, Mrs. Daniels argues that Osiris breached the industry standard that a mortician be present during the disinterment. She asserts that, if a mortician had been present

> when the OBC first became compromised when the lid cracked, the mortician would have been able to move the remains to the new OBC that they had on hand just for this purpose, and then the [cemetery operators] could have continued to remove the compromised OBC from the grave site and prepare it for the next burial.

21

Instead, the cemetery operators tried to lift the OBC with the cracked lid, which resulted in the lid sliding sideways and exposing Mr. Daniels' remains inside the OBC. Mrs. Daniels asserts that, at this point, the mortician could have moved the remains to the new OBC for transport. Instead, "they continued and replaced the lid and tried to lift the OBC again, which is when it was dropped back into the grave and the remains of [her] son partially ejected."

Mrs. Daniels further argues that the cemetery operators were negligent in waving her back to the gravesite. She asserts that, if they had warned her to stay away, she would "have been spared the sight of her son's remains being dropped back into the grave."

Finally, Mrs. Daniels suggests in a brief paragraph that the doctrine of *res ipsa loquitur* supports the jury's verdict.[17] In that regard, she notes that the court rejected her proposed instruction on that doctrine, and she states summarily that "it would be difficult to find an average layperson who would hear the facts of this case and see the pictures from the disinterment and think that this disinterment was properly conducted."[18]

---

[17] Where a plaintiff has no direct proof of the defendant's negligence, the doctrine of *res ipsa loquitur* allows the plaintiff to "rely on the inference of negligence to be deduced from all the circumstances." *Colbert v. Mayor & City Council of Balt.*, 235 Md. App. 581, 590 (2018) (quoting *Hickory Transfer Co. v. Nezbed*, 202 Md. 253, 262 (1953)). *Res ipsa loquitur* "allows a plaintiff the opportunity to establish a *prima facie* case when he could not otherwise satisfy the traditional requirements for proof of negligence." *Id.* (cleaned up). "The doctrine applies when 'the instrumentality causing injury is in the exclusive control of the defendant, and it is assumed he is in the best position to explain how the accident happened.'" *Id.* (quoting *Peterson v. Underwood*, 258 Md. 9, 19 (1970)).

[18] As Osiris points out, *res ipsa loquitur* was not raised below. Although Mrs. Daniels did present a proposed jury instruction regarding *res ipsa loquitur*, which the court rejected, she did not argue that doctrine in response to the motion for judgment or JNOV,

22

In an action for negligence,

> a plaintiff bears the burden of proving: "1) that the defendant was under a
> duty to protect the plaintiff from injury, 2) that the defendant breached that
> duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss
> or injury proximately resulted from the defendant's breach of that duty."

*Steamfitters Loc. Union No. 602 v. Erie Ins. Exch.*, 469 Md. 704, 727 (2020) (quoting

*Rowhouses, Inc. v. Smith*, 446 Md. 611, 631 (2016)). As explained below, we conclude

that Mrs. Daniels met her burden of providing evidence from which a jury could find that

Osiris was negligent.

## I.

## Duty

"'The determination of whether a duty exists is a legal conclusion that this Court

reviews' without deference." *Hancock v. Mayor & City Council of Balt.*, 480 Md. 588,

603 (2022) (quoting *Steamfitters Loc. Union No. 602*, 469 Md. at 727). A duty, "for

purposes of negligence, [is] 'an obligation, to which the law will give recognition and

effect, to conform to a particular standard of conduct toward another.'" *Kennedy Krieger*

*Inst., Inc. v. Partlow*, 460 Md. 607, 633 (2018) (quoting *Dehn v. Edgecombe*, 384 Md. 606,

619 (2005)). "[T]he determination of whether a duty exists represents a policy question of

---

and she did not object to the court's failure to include her proposed instruction. *See*
Maryland Rule 8-131(a) ("Ordinarily, an appellate court will not decide any other issue
unless it plainly appears by the record to have been raised in or decided by the trial court.");
Md. Rule 2-520(e) ("No party may assign as error the giving or the failure to give an
instruction unless the party objects on the record promptly after the court instructs the jury,
stating distinctly the matter to which the party objects and the grounds of the objection.").
Thus, this issue was not properly preserved for review, and we will not address it.

whether the specific plaintiff is entitled to protection from the acts of the defendant." *Hancock*, 480 Md. at 604 (quoting *Gourdine v. Crews*, 405 Md. 722, 745 (2008)).

The parties have not cited to any Maryland cases addressing the issue of a cemetery's duty in burying or disinterring a person's remains. Other courts, however, have addressed the issue.

In *Whitehair v. Highland Memory Gardens, Inc.*, 327 S.E.2d 438, 440 (W. Va. 1985), the Supreme Court of Appeals of West Virginia noted that "[u]nder the early common law in England, matters relating to the burial and preservation of dead bodies were within the exclusive jurisdiction of the ecclesiastical courts, so that no action for damages would lie for injuries or indignities inflicted upon a corpse." In the United States, however, where there are no ecclesiastical courts, "the law has long recognized a 'quasi-property' right in the survivors to control the disposition of [the decedent's] remains," which includes "the right to custody of the body; to receive it in the condition in which it was left, without mutilation; to have the body treated with decent respect, without outrage or indignity thereto; and to bury or otherwise dispose of the body without interference." *Id.* at 440-41. The act of disinterring a body "must be performed in a decent manner and with due regard to the rights of persons interested." *Id.* at 441 (quoting Annot., 21 A.L.R.2d 472, 489 (1952); 22 Am. Jur. 2d *Dead Bodies* § 23 at 572 (1965)). Accordingly, "a cause of action exists for negligently . . . mishandling . . . a dead body, even when its disinterment and reinterment are authorized." *Id.* at 442. *Accord Mayer v. Turner*, 234 S.E.2d 853, 855 (Ga. Ct. App. 1977) (where a party is "contractually obligated to handle a corpse," the party has a legal duty to handle the corpse "non-negligently and with utmost dignity").

24

We agree with the reasoning in these cases. We hold that a cemetery has a duty of care in disinterring or otherwise handling a dead body. Indeed, counsel for Osiris conceded at oral argument that a cemetery has a duty of care to the family of the decedent during a disinterment. He stated that the issues raised on appeal involved the applicable standard of care imposed by that duty and whether the evidence showed a breach of that standard of care. We turn to address those issues now.

## II.

### Applicable Standard of Care

Appellants contend that expert testimony is required to establish the applicable standard of care in this case because the requirements of a disinterment are "beyond the purview of an average layperson." In support, they note that, before a cemetery can disinter human remains, it must complete or obtain "multiple legal procedures, permits, and applications," and the disinterment process itself involves the use of machinery for "securing and removing objects from the ground." They assert that multiple jurisdictions require expert testimony to establish the standard of care for cases involving the funeral and cemetery industries. Appellants argue that there was no evidence that they breached any applicable standard of care, and Mrs. Daniels failed to present evidence supporting an inference of negligence to be presented to the jury.

Mrs. Daniels disagrees. She contends that, although a mortician must receive a specialized degree and pass a rigorous exam to practice their profession, a cemetery operator does not rise "to the level of a specialized profession," and "the burial process itself – and by extension the disinterment process – is not so technical" as to require expert

25

testimony regarding the applicable standard of care. Mrs. Daniels argues that industry standards can be admitted to show the applicable standard of care, she presented such industry standards, which were "easily understood by the average layman," and the evidence showed that Osiris breached those standards.

"Generally, the applicable standard of care in a negligence action is whether the defendant acted reasonably as measured against a hypothetical 'reasonable' similar actor in similar circumstances." *Am. Radiology Servs., LLC v. Reiss*, 470 Md. 555, 579 (2020) (quoting *Armacost v. Davis*, 462 Md. 504, 526 (2019)). "In a negligence claim against a provider of professional services, the professional is held to the standard of care of his or her profession." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 610-11 (2017). *Accord Armacost*, 462 Md. at 526 (a professional "owes a special duty of care to a client or patient that is beyond the duty that would be owed by a general member of the public and that is commensurate with the professional's training and expertise"). Accordingly, where the conduct of a professional, a person who has "special training and expertise like doctors," is at issue, that conduct "should be 'measured against the standard of [care of] a hypothetical reasonable person with similar training and expertise.'" *Harris-Reese v. United States*, 615 F. Supp. 3d 336, 368-69 (D. Md. 2022) (quoting *Armacost*, 462 Md. at 526).

"Because the duty of care owed by a professional is based upon the professional's special expertise, its parameters may not be within the common knowledge of the average layperson juror." *Am. Radiology Servs., LLC*, 470 Md. at 580. Thus, in a negligence action against a professional, expert testimony may be necessary to establish the standard of care

26

owed by the professional because "professional standards are often 'beyond the ken of the average layman,'" and therefore, such testimony "is necessary to elucidate the relevant standard for the trier of fact." *Schultz v. Bank of Am.*, 413 Md. 15, 28 (2010) (quoting *Bean v. Dep't of Health & Mental Hygiene*, 406 Md. 419, 432 (2008)). Expert testimony is *required*, however, "only when the subject of the inference . . . is so particularly related to some science or profession that is beyond the ken of the average layman." *Johnson v. State*, 457 Md. 513, 530 (2018) (quoting *Bean*, 406 Md. at 432).

"When a court considers whether testimony is beyond the 'ken' of the average layman, the question is not whether the average person is already knowledgeable about a given subject, but whether it is within the range of perception and understanding." *State v. Galicia*, 479 Md. 341, 394, *cert. denied*, 143 S. Ct. 491 (2022). "If a jury can use its 'common knowledge or experience' to recognize a breach of a duty, then expert testimony is unnecessary to calibrate the exact standard of care owed by the defendant." *Jones v. State*, 425 Md. 1, 27 (2012) (quoting *Cent. Cab Co. v. Clarke*, 259 Md. 542, 551 (1970)).

Expert testimony is not required to establish the standard of care "in every case involving alleged negligence by a professional" because "sometimes the alleged negligence, if proven, would be so obviously shown that the trier of fact could recognize it without expert testimony." *Schultz*, 413 Md. at 29. For example, an expert witness is not needed to explain the standard of care in cases where "a dentist extracts the wrong tooth, a doctor amputates the wrong arm, or leaves a sponge in a patient's body." *Id.*

Whether expert testimony is required to establish the standard of care for cemeteries is a question of first impression in Maryland. Osiris points to cases from other jurisdictions

27

for the proposition that expert testimony is required to establish the standard of care in the funeral and cemetery industries. To be sure, there may be situations where expert testimony would be required in a negligence suit against a cemetery. *See, e.g.*, *Waterman v. Weinstein Mem'l Chapel*, 853 N.Y.S.2d 623, 624 (N.Y. App. Div. 2008) (expert testimony required to establish that casket was defective and failed to protect decedent's remains); *Giantonnio v. Taccard*, 676 A.2d 1110, 1116 (N.J. Super. Ct. App. Div. 1996) (expert testimony required regarding funeral home's standard of care in safely conducting a funeral procession).

In this case, however, expert testimony was not necessary to show a breach of the applicable standard of care. As the parties recognize, industry standards can be admitted to show the applicable standard of care in a negligence cause of action. *CSX Transp., Inc. v. Pitts*, 430 Md. 431, 463 (2013). *Accord Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 544 (1986) ("As in any other negligence case, an industry standard, if it exists, may be proven as evidence of the applicable standard of care.").

Here, Mr. Davis, the general manager of the cemetery at the time of his deposition, testified regarding industry standards for a disinterment. He stated that a cemetery must have a mortician present at a disinterment, from the opening of the grave until "the body is pulled out of the ground." Because there is a high probability that an OBC will break during a disinterment, it is industry policy to have an extra OBC present during a disinterment. He explained that, if the OBC becomes compromised prior to "getting it out of the ground," someone—presumably the mortician—"would have had to have gone in

28

there, picked up -- picked the individual up out of the outer burial container" and placed the remains in the new OBC that was standing by.

Based on this evidence, a reasonable fact finder could determine that the applicable standard of care owed by Osiris during the disinterment was to have an extra OBC on site, to have a mortician present, and once the lid cracked and the OBC became compromised, the mortician present should have moved Mr. Daniels' remains from the compromised OBC to the new OBC before continuing to bring Mr. Daniels' remains out of the grave.[19]

Mr. Davis also testified that professional standards for cemetery operators required that they "[a]ct in a manner that respects and protects the dignity of the decedent and the decedent's family." There was sufficient evidence of standards of care of a cemetery performing a disinterment.

## III.

## Breach of Duty

Mrs. Daniels contends that Osiris breached its duty of care in the following ways: (1) they failed to have the disinterment completed on time; (2) they waved her over to the gravesite and failed to communicate what was going to happen; and (3) they failed to have a mortician present during the disinterment. She also notes that Mr. Davis acknowledged

---

[19] Mr. Smith testified that, if the OBC becomes compromised, and it is able to be removed from the ground, at that time a mortician would transfer the deceased's remains to a new OBC. It was for the jury to determine which testimony to credit. *Christian v. Maternal-Fetal Med. Assocs. of Md., LLC*, 459 Md. 1, 24 (2018) (alterations in original) ("[I]t is the province of the jury to assess credibility when confronted with conflicting testimony.") (quoting *Legal Aid Bureau, Inc. v. Bishop's Garth Assocs. Ltd. P'ship*, 75 Md. App. 214, 223 (1988)).

that conducting a disinterment properly and respectfully "would preclude having remains spilled."

Osiris disagrees. Appellants argue that the "fact-finder could only speculate as to whether or not the 'wave-over' breached any standard of care." They argue that "the mere fact" that the OBC "became compromised and fell back into the grave site is not evidence of negligence," and Mrs. Daniels failed to present any evidence regarding whether (1) Osiris "mishandled the disinterment equipment and machines; (2) the equipment malfunctioned and/or failed; (3) the grave liner was secured improperly; (4) the methods utilized to remove the grave liner were improper; (5) or, most importantly, if there was any negligent act *at all*."

"A duty is breached when a person or entity fails to conform to an appropriate standard of care and, in doing so, fails to protect third persons against unreasonable risks." *Troxel v. Iguana Cantina, LLC*, 201 Md. App. 476, 501 (2011), *cert. denied*, 424 Md. 630 (2012). In determining whether Mrs. Daniels presented sufficient evidence to establish that Osiris breached their duty to her, we view "the facts adduced at trial" in the light most favorable to Mrs. Daniels, and we determine whether "any reasonable fact finder could find the existence" of a breach of duty "by a preponderance of the evidence." *Marrick Homes LLC*, 232 Md. App. at 707-08 (quoting *Univ. of Md. Med. Sys. Corp.*, 203 Md. App. at 329).

We dispose quickly of the contentions that a breach of duty was shown based on the failure of the disinterment to be completed at the time Osiris stated or that a cemetery operator waved to Mrs. Daniels. There was no expert testimony or other testimony

30

regarding industry standards in that regard. The evidence was insufficient to show that those actions constituted a breach of the standard of care.

The evidence regarding the presence of the mortician, however, was sufficient to support a finding of a breach of duty. As indicated, there was evidence that the industry standard was to have a mortician present at the gravesite during the entire process of a disinterment. Mrs. Daniels and Ms. Daniels gave undisputed testimony that there was no mortician at the gravesite from the time the OBC first became compromised, when the lid cracked, until after the OBC dropped and Mr. Daniels' remains spilled out of the OBC into the burial plot. Mrs. Daniels argued that, if Osiris had followed industry standards and had a mortician present during the disinterment, her son's remains could have been moved immediately from the compromised OBC to the new OBC, and his remains could have been respectfully moved into the new OBC, instead of spilling from the compromised OBC.

When Mr. Davis was asked whether the cemetery would acknowledge that what happened during Mr. Daniels' disinterment was "not what is supposed to happen as far as spilling the remains either partially or wholly" from the OBC, he stated that the cemetery "takes every precaution to ensure that the disinterment is done properly and respectfully and that would preclude having remains spill." He further stated that the cemetery "takes every precaution to make sure that mistakes are not made, but sometimes mistakes are made."

Based on the evidence presented, and the inferences that could be drawn from that evidence, a reasonable fact finder could determine that Osiris breached its duty to exercise

31

reasonable care by failing to have a mortician present to transfer Mr. Daniels' remains to a

new OBC when the OBC in which he was buried became compromised. The circuit court

did not err in denying Osiris' motion for judgment notwithstanding the verdict.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**